## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**JOSEPH DOUGHERTY, et al.** | **CRIMINAL ACTION**<br><br>**NO. 14-69** |
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**SHAWN BAILEY** | **CRIMINAL ACTION**<br><br>**NO. 14-435** |
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**GREGG SULLIVAN** | **CRIMINAL ACTION**<br><br>**NO.   14-436** |
| **UNITED STATES OF AMERICA**<br><br>v.<br><br>**JAMES ZINN** | **CRIMINAL ACTION**<br><br>**NO. 14-501** |

**Baylson, J.**                                                                                     **March 31, 2015**

### MEMORANDUM RE SENTENCING OF DEFENDANTS

"All punishment is for Example's Sake" – Francis Bacon[1]

Deterrence of defendants, and others, is a major goal in the imposition of criminal

sentencing; and is, without question, a most important sentencing factor in these cases.

---

1 The use of the Law 4 (DeCapo Press 1969) (1630).   Francis Bacon served as Attorney General and Lord
Chancellor of England. He is sometimes suggested as author of works attributed to Shakespere.

## I.    Introduction

The defendants' conduct, arising out of their membership in Ironworkers Local 401, established a culture of crime for many years.   Of the twelve individual defendants, eleven have pled guilty to criminal conduct and one, the union leader, Joseph Dougherty, was convicted on six counts after a jury trial.

This Memorandum is being filed, as of the first sentencing, to set the background and to assure that all defendants, their families, the victims, and the public at large are aware of the totality of criminal circumstances that enveloped this City and are relevant in determining the sentence of each defendant.   Philadelphia area contractors and businesses, who needed ironworkers' skills, suffered significant financial loss, personal danger, and property damage; the public suffered from a wave of crime committed with motives of retaliation, retribution, greed, and violence.

Labor unions evolved after many years of deprivation for low wage workers in the United States, eventually achieving a significant role in our economy.   Unions serve their members with higher wages, productivity, opportunities for education and advancement, and wellbeing for their families.

To be sure, the criminal activities of these ironworkers, as developed in this case, were aberrational, but not novel.   In particular, much of the history of construction unions in Philadelphia has been one of strife, corruption, violence, and discrimination.[2]

---

2  Although not relevant to the sentencing of defendants, the Court notes only for completeness of the recent history of Philadelphia construction unions, that allegations of discriminatory conduct toward racial minorities have been the topic of much litigation. In 1975, African-American ironworkers brought a class action against Ironworkers' Local 401—the union to which defendants belong—and several contractors, alleging racial discrimination in hiring and access to ironworking jobs. See Earline Ray v. Ironworkers Local No. 401, No. 75-3657 (E.D. Pa. 1975).   The parties entered into a Consent Decree in 1982, which established the goal of assigning 18 percent of available work to minorities in the ironworking industry.   See Brundage v. Int'l Ass'n of

In sentencing these defendants, the Court will, of course, fully abide by the sentencing factors set forth in 18 U.S.C. § 3553(a), as follows:

> " (a) Factors to be considered in imposing a sentence. – The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.   The court, in determining the particular sentence to be imposed, shall consider –
>
> > (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> >
> > (2) the need for the sentence imposed –
> >
> > > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> > >
> > > (B) to afford adequate deterrence to criminal conduct;
> > >
> > > (C) to protect the public from further crimes of the defendant; and
> > >
> > > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;"

The Court will take into account all of these factors and will also follow the procedures required by the Third Circuit, which, stated briefly, require:

1.      Determining the offense level pursuant to the United States Sentencing Guidelines;

2.      Ruling on any motions for departures or variances from the applicable guidelines that may be made by the government and/or the defendant; and

3.      Applying the sentencing factors set forth above to each defendant and the resulting sentence as determined by the Court.   United States v. Flores-Mejia, 759 F.3d 253, 255-56 (3d Cir. 2014) (citing United States v. Gunter, 462 F.3d 237, 247 (3d Cir. 2006)).

---

Bridge, Structural, and Ornamental Ironworkers, Local No. 401, No. 00-4549, 2007 WL 3119856, at *1 (E.D. Pa. Oct. 24, 2007) (discussing prior history in a subsequent class action suit against Local 401 alleging racial discrimination).   The Consent Decree was dissolved in 1997.   Id.

In addition, restitution to the victims is required by law and will be imposed, and victims may be heard.   The Court will consider the Presentence Reports prepared by the Probation Office, copies of which will have been provided to defense counsel and their clients in advance of the sentencing hearing.   Defendants are welcome to present factual or character testimony, and other relevant material, and to speak in the nature of an allocution, prior to the imposition of sentence.

The conduct alleged in the Superseding Indictment, and thus admitted as to those defendants who pled guilty to one or more counts of the Superseding Indictment, or in the separate Informations, established a pattern of violence that is simply unacceptable in a civil society.   In our nation's free-market economy, competition is just as welcome, and expected, between General Motors, Ford, and Chrysler as it is between union and non-union contractors and their employees. Union membership brings many benefits to union members, contractors, and building owners – but some owners and contractors prefer non-union workers.   Their reasons may be faulted or their policies misguided, but in a free economy, they have that right.

Union membership does not bring exclusivity, the opportunity for monopolization of the labor force, or a license to commit crimes purportedly for the benefit of union members.

For many years, the ironworkers conducted a campaign of violence against building owners and building contractors who dared to hire non-union labor.   Ironworkers Local 401 decided that employment of non-union ironworkers was a scourge, a plague, and adopted many lawless and criminal activities to combat the competition from non-union ironworkers.   Those rights guaranteed by the First Amendment -- the right of assembly, the right of free speech, and the right of petition -- are to be enjoyed by union members, to be sure.   However, defendants ignored the line between lawful and criminal conduct.   For this, they must be punished.

4

This Memorandum will detail some prior Philadelphia-area examples of violence by union workers, such as the roofers union, against non-union contractors.   Despite these past incidences, criminal prosecutions, and civil injunctions, the ironworkers either were not listening, didn't care, or thought they couldn't be caught.   However, justice has caught up with them, and it is my duty to impose sentences.

## II.    Deterrence as a Sentencing Factor

Deterrence must play an important role in sentencing defendants because of union violence in Philadelphia must become a relic of the past, not to be repeated. The criminal acts of many ironworkers, as detailed in the Superseding Indictment and placed on the record as part of the guilty plea colloquies for the eleven defendants who pled guilty, and in greater detail at the Dougherty trial (summarized below), showed that for a number of years, ironworker violence continued without drawing much focus of law enforcement.   Prior to this case, review of media reports show only sporadic prosecution of ironworkers by local law enforcement – despite their numerous crimes -- which is not stated as criticism, but rather as reflective of the methodology used by the ironworkers to avoid detection.[3]

The need for defendants' sentences to "afford adequate deterrence to criminal conduct" is one of the sentencing factors that the Court must consider.   18 U.S.C. § 3553(a)(2)(B). Indeed, multiple Courts of Appeal have commented that "general deterrence . . . is one of the key purposes of sentencing."   United States v. McQueen, 727 F.3d 1144, 1158 (11th Cir. 2013) (quoting United States v. Medearis, 451 F.3d 918, 920-21 (8th Cir. 2006)).   As the

---

[3] Once again in this case, federal law enforcement, including the use of Court-approved wiretap evidence, grand jury testimony, and cooperation from those with information of value to the prosecution, has led to these convictions and sentencings – all of which is to the benefit of the public.

Supreme Court has explained, deterrence is "[a]n important function of the corrections system."   Pell v. Procunier, 417 U.S. 817, 822 (1974).   One of the premises of the penal system is that "by confining criminal offenders in a facility where they are isolated from the rest of society, a condition that most people presumably find undesirable, they and others will be deterred from committing additional criminal offenses."   Id.

Both Congress and the federal courts have recognized that deterrence is especially relevant to so-called "white collar" crimes and defendants with an economic motive to commit crimes, such as defendants.   In this case, the evidence clearly warrants a conclusion that the defendants acted with an economic motive, but their crimes can hardly be called "white collar."

In enacting Section 3553, Congress noted that deterrence can be "particularly important" for crimes where small fines or other minor punishments would otherwise "be written off as a cost of doing business."   S. Rep. No. 98-225, at 76, 1984 U.S.C.C.A.N. 3182, 3259 (discussing white collar crimes).   Similarly, "economic and fraud-based crimes" are "prime candidates for general deterrence" because they "are more rational, cool, and calculated than sudden crimes of passion or opportunity."   United States v. Musgrave, 761 F.3d 602, 609 (6th Cir. 2014) (internal quotation marks omitted).   In a recent non-precedential opinion, the Third Circuit affirmed a sentence for conspiracy to commit extortion that "cited deterrence as a major consideration" because of the nature of the crime and the defendant.   United States v. Castro, 573 F. App'x 214, 218 (3d Cir. 2014) (defendant, a former high-ranking police official, received an upward variance in part because Judge Bartle of this Court cited a need to "signal to the police and to the citizenry of Philadelphia that criminal conduct by police officers will

6

not be tolerated").

Seventh Circuit Judge Richard Posner has frequently applied economic principles in his judicial decisions, see, e.g., U.S. v. Goldberg, 491 F.3d 668 (7th Cir. 2007), and in his writings as a law professor, see Economic Theory of Criminal Law, 85 Columbia Law Review, 1193 (1985).   Racketeering and extortion, as charged in this case, are basically economic crimes where the defendant has a profit motive.   Defendants acted as a criminal cartel to prevent non-union contractors from taking ironworker wages away from union members. Posner's writings condemn exclusionary cartels as economically dangerous and support deterrence as a legitimate factor in sentencing to discourage individuals from committing economic crimes in the future.

The social context in which crimes occur can also make general deterrence more important.   "[T]he incidence of particular crimes in the relevant community appropriately informs and contextualizes the relevant need for deterrence." United States v. Flores-Machicote, 706 F.3d 16, 22-23 (1st Cir. 2013), which affirmed a sentence that took into account the need for deterrence given "the incidence and trend lines of particular types of crime in the affected community."   Similarly, in a case involving extortion committed by a public official, the Sixth Circuit affirmed a sentence based in part on the need for general deterrence given "the widespread corruption problem facing the county and surrounding areas."   United States v. Watkins, 691 F.3d 841, 853 (6th Cir. 2012). Approximately ten years ago, I imposed a lengthy prison sentence on the former Treasurer of Philadelphia, convicted of corruption and other offenses, and cited deterrence as a major factor.

Two of the offenses charged in the Superseding Indictment, 18 U.S.C. §§ 844(h) and

7

844(i), carry mandatory minimums of ten years and five years, respectively.   Therefore, defendant Dougherty, convicted of both after trial, is subject to a 15 year mandatory minimum, plus whatever sentence may be imposed on other counts of conviction, up to the maximum sentence allowed by law.

Mandatory minimums have attracted controversy over a continuum of years, much of it critical.   However, Congress has shown no interest in removing mandatory minimums from those statutes in which they currently exist.   Mandatory minimums are most often applied in drug and gun cases, but as the present case shows, they also exist for arson.

In this case, the mandatory minimums faced by those defendants charged with the arson offenses were undoubtedly a motivating factor in their deciding to cooperate with the government.   If the government files a motion that it is satisfied with cooperation by a defendant, subject to Court approval, see 18 U.S.C. § 3553(e), then the Court is authorized to basically "ignore" the mandatory minimum in imposing a sentence.

Whether mandatory minimums result in deterrence of crime is a hotly debated topic. A recent study by the United States Sentencing Commission reviewed mandatory minimums and cited authoritative studies both in favor of and in opposition to the existence of mandatory minimums in the federal sentencing process.   A major criticism of mandatory minimums is the power given to prosecutors to demand guilty pleas and cooperation as the "price" of requesting the Court to ignore a mandatory minimum because this structure gives prosecutors too much power over the criminal adjudicative and sentencing process.

One answer to this objection is that fostering cooperation by guilty defendants is very much in the public interest.   Decades of experience have shown that securing cooperation

from guilty persons leads to prosecutions against others, both the more culpable as well as the

less culpable, and also getting information on other crimes, the perpetrators of which were

previously unknown to law enforcement.

A judge must always be careful that the process does not result in the conviction of a

person innocent of the crime, who may feel compelled to plead guilty because of the threat of a

lengthy sentence.

Although commentators debate which aspects of sentencing are most important for

deterrence, empirical studies have found that some combination of sentence certainty and

sentence severity has a deterrent effect.   See, U.S. Sentencing Commission, Report to

Congress: Mandatory Minimum Penalties in the Federal Criminal Justice System, 86-88,

98-99 & n., 468-72, 527-29 (Oct. 2011) (citing and quoting various commentators).

However, on the issue of deterrence, common sense tells us that many individuals, if

not all, are truly "deterred" from committing crimes by the existence of penalties for

conviction.   Since Congress has dictated consideration of deterrence in the statute, the Court

will do so, and will give it heavy emphasis.

### III.    Summary of Labor Law History

The right of unions to organize and bargain collectively was first established in 1935 by

the Wagner Act.   49 Stat. 449 (1935), codified as National Labor Relations Act ("NLRA"), 29

U.S.C. §§ 151 et seq.   The NLRA was enacted to "encourag[e] the practice and procedure of

collective bargaining and . . . protect[ ] the exercise by workers of full freedom of association,

self-organization, and designation of representatives of their own choosing, for the purpose of

negotiating the terms and conditions of their employment or other mutual aid or protection."

Wagner Act § 1, 49 Stat. 449, 449-50, <u>codified at</u> 29 U.S.C. § 151.   The NLRA also

established the National Labor Relations Board ("NLRB") and the various procedures that

underlie the NLRB's activities and its supervision of the relationships between employers and

employees.   Wagner Act §§ 3-6, 10-12, 49 Stat. 449, 451-57, <u>codified at</u> 29 U.S.C.

§§ 153-156, 160-162.   The NLRA's validity was upheld by the Supreme Court in the seminal

case of <u>NLRB v. Jones & Laughlin Steel Corp.</u>, 301 U.S. 1, 57 S. Ct. 615 (1937).

Twelve years after the passage of the Wagner Act, the NLRA was amended by the

Taft-Hartley Act, 61 Stat. 136 (1947). In particular, the Taft-Hartley Act added new provisions

regarding the collective bargaining process and unfair labor practices by labor unions.

Taft-Hartley Act § 101, 61 Stat. 136, 140-43, <u>codified at</u> 29 U.S.C. § 158.   A third significant

amendment of the NLRA occurred in 1959, when the Landrum-Griffin Act made various

changes and additions, including new provisions regarding the internal operations of unions

and the rights of unionized workers within their unions. 73 Stat. 519-46 (1959).

In its current form, the NLRA expressly protects unionized employees' right to strike,

unless specific exceptions apply.   29 U.S.C. § 163; <u>see</u> 29 U.S.C. § 158(b)(4) (setting out

specific circumstances in which a strike is an unfair labor practice). The NLRA also expressly

protects employees' right to picket "for the purpose of truthfully advising the public (including

consumers) that an employer does not employ members of, or have a contract with, a labor

organization."   29 U.S.C. § 158(b)(7)(C).   However, the courts have long held that strikes or

picket lines that employ violence, intimidation, or threats of violence are not protected by

federal law.   <u>See</u> <u>Int'l Union, United Auto., Aircraft & Agr. Implement Workers of Am.</u>

<u>(UAW-CIO) v. Russell</u>, 356 U.S. 634, 640 (1958).   For example, in <u>Russell</u>, the Supreme

Court noted that "mass picketing and threats of violence" that prevented other employees from getting to work "clearly w[ere] not protected by federal law."   Id. at 638, 640. Likewise, the Third Circuit has affirmed the NLRB's determination that a union's picketing actions that "threatened to inflict bodily injury upon employees, damaged property of the Company and others, and interfered with or blocked ingress and egress of employees and others to the premises of the Company" constituted a prohibited, unfair labor practice.   Local 542, Int'l Union of Operating Eng'rs, AFL-CIO v. NLRB, 328 F.2d 850, 852-53 (3d Cir. 1964).   In short, unions have a right to strike and to picket, but that right does not permit acts of violence, vandalism, or intimidation.

## IV.   Unlawful Conduct in Philadelphia by Union Members, Including Competition with Non-Union Contractors

Some Philadelphia building trades unions have a history of engaging in acts of violence, intimidation, and other unlawful conduct to prevent developers and contractors from employing non-union labor.   The Court anticipates and assumes that the sentences to be imposed will deter commissions of similar crimes in the future.

A.   Altemose

The most notorious incident occurred on June 5, 1972, when about 1,000 union members stormed the Valley Forge building site of builder J. Leon Altemose.   See Altemose Constr. Co. v. Building and Constr. Trades Council of Phila., 296 A.2d 504, 507 (Pa. 1972) (affirming lower court's issuance of an injunction against the Building and Construction Trades Council of Philadelphia and the unions), cert. denied, 411 U.S. 932 (1973).   The union members caused about $300,000 in damage in a "virtual military assault":

4,000 feet of eight-foot high cyclone fence was leveled; an office building,

11

guard [h]ut, and construction trailer were burned to the ground; bulldozers, graders and pans were set afire, or battered with hammers and bars, and lime was added to the fuel tanks of these vehicles. Two security guards were stoned and their vehicle totally destroyed. Local police were impotent to control the mob, and fire trucks dispatched to the scene were turned back because the safety of the firemen was endangered. Throughout this entire scene of violence and destruction a crowd of members of the Council cheered; not until the state police arrived was order restored.

Id. at 507.

The Pennsylvania Supreme Court noted the lower court's finding "that defendants' picketing had become so enmeshed with violence, harassment, intimidation and property destruction that an atmosphere of fear and terror survives even in the absence of picketing." Id. at 509. Other acts of violence and intimidation included the burning of a construction trailer and five trucks belonging to Altemose's company, the burning of seven trucks of another contractor, and assaults of the employees of several non-union contractors. Id. at 509. The court also noted that Altemose and other employees of his corporation "have received numerous threats to their lives and the lives and safety of their families." Id. Eleven union members eventually went to prison for the Valley Forge attack. See Michael L. Rozansky, Recalling the Taking of Valley Forge, Phila. Inquirer, June 8, 1992, at D1.

On August 18, 1972, hours after arrest warrants were issued for the Valley Forge incident, Altemose was beaten in Center City Philadelphia by picketers at a bank that financed his projects. Id. Three roofers were charged with the beating but were acquitted. Id.

Altemose subsequently brought an antitrust lawsuit against the Building and Construction Trades Council of Philadelphia and 56 local unions, alleging that the unions conspired to eliminate competition by excluding open-shop contractors and forcing contractors to employ only union subcontractors. See Altemose Const. Co. v. Building & Cons. Trades

12

Council of Phila. and Vicinity, 751 F.2d 653, 654 (3d Cir. 1985), cert. denied, 475 U.S. 1107

(1986).   Reversing the district court's grant of summary judgment in favor of the unions and

concluding that there were disputes of material fact, the Third Circuit discussed the record

evidence of union antitrust violations:

> The record contains circumstantial evidence that the unions maintained a fair
> contractor list; that the Council exerted primary and secondary pressure which
> had the inevitable effect of benefiting contractors on the list; that firms not on
> the list were almost totally excluded from the market; that the General Building
> Contractors Association policed its members to prevent use of non-union
> contractors, although the contractors' economic interest would suggest, *prima
> facie*, use of the lowest responsible bidders without regard to unionization; and
> that an officer of the Council offered to obtain bids from firms on the fair
> contractors list if Altemose would sign a Building Trades Agreement.

Id. at 658.   In 1988, the defendants reportedly settled the suit for more than $1 million.   See

Rozansky, supra.

    B.    Criminal Proceedings Against Roofers Union

    Beginning in 1986, Philadelphia was engulfed by revelations that members of the local

roofers union had been giving cash gifts and gratuities to various state court judges and other

public officials.   These revelations led to a lengthy indictment for corruption, racketeering,

and extortion in violation of the Hobbs Act, among other crimes, for using threats of violence,

or fear, to force union contractors to hire union roofers for additional hours and to compel

non-union contractors to become union contractors (Criminal No. 86-451).   Criminal charges

were brought against the leader of the local union, Stephen Traitz, and twelve other union

members.   After a lengthy trial, all defendants were convicted and Judge Katz sentenced them

to lengthy prison terms.

    In U.S. v. Traitz, 871 F.3d 368 (3d Cir., 1989), the Court affirmed the convictions,

13

stating:

> "The meetings with the contractors were shown to be confrontational and intimidating in that the principals were often threatened and abused by union officials—typically the union business agents who were ex-amateur or ex-professional boxers." Id. at 375.

In addition, there were concurrent and parallel proceedings in the Montgomery County Court of Common Pleas against a number of members of Local 30 for acts of violence, with convictions and concurrent sentences.

C.     Roofers Union Civil RICO Case

The criminal proceedings initiated against members of the Philadelphia roofers union, reviewed below in the discussion of extortion, were followed by a government civil suit.   On December 2, 1987 (C.A. # 87-7718), the government initiated a civil RICO action against the Philadelphia Roofers Union Local 30 and thirteen individual union leaders who had been convicted of numerous offenses in the separate criminal action summarized above.   Judge Bechtle of this Court granted injunctive relief against the individual union leaders, prohibiting them from "participating in the affairs of the Roofers Union" or working in the construction industry.   See, United States v. Local 30, United Slate, Tile & Composition Roofers, Damp & Waterproof Workers Ass'n, 686 F. Supp. 1139, 1141 (E.D. Pa. 1988), aff'd, 871 F.2d 401, 404 (3d Cir. 1989).   The court further "imposed a 'decreeship'" over the union and appointed a "'court liaison officer' as the principal enforcement officer." Id.   The decreeship placed union expenditures under court control, granted the court access to all union records, and required the court liaison to exercise in-person supervision over all collective bargaining negotiations.   Id.   The union was also compelled to adopt "a grievance/arbitration" procedure for contract disputes with employers and to submit to an audit.   Id.   The Third Circuit upheld

14

the decreeship under the RICO civil injunction provision, 18 U.S.C. § 1964(a).   Id.

Under the supervision of the Court Liaison Officer, the district court retained control over the union until 1999, when the court vacated the injunction's decreeship provision because "activities and conditions at Local 30 had improved considerably."   United Union of Roofers, Waterproofers & Allied Workers, AFL-CIO v. Composition Roofers Union, Local 30, United Union of Roofers, Waterproofers & Allied Workers, AFL-CIO, No. 03-cv-1699, 2003 WL 21250627, at *3 (E.D. Pa. Mar. 28, 2003).   Problems with the Union continued, however, which resulted in the district court approving the international union's imposition of an emergency trusteeship over the local in 2003 (C.A. #03-1699).   This case was settled in 2006.

The original injunction's prohibitions on the individual leaders' participation in Union affairs and employment in the construction industry remain in effect.   Id. at *3.   In 1998, one defendant's request to reenter the roofing industry was rejected.   Judge Bechtle's eloquent reasoning bears repetition, because the facts show that the defendants in this case had not been deterred by the strong penalties and injunctive orders entered by this Court in prior cases:

> The court decided after extensive court proceedings and examination of the long history of Local 30's activities, that the only chance for survival of the union and its value to the community and its membership would be the barring of those associated with violence in the union from re-entering the roofing industry within the jurisdiction of Local 30.   Id. at 1171.   The passage of time has a natural tendency to lower the peaks and fill the valleys of memory and resolve.   If that is allowed to happen here then some of the worst episodes of violence in the labor movement in the Philadelphia region will be permitted to re-appear.   The brutal and lawless beatings inflicted upon persons in the roofing industry by the robots of union leadership was a sordid spectacle arrogantly played out time and time again for 20 years beginning in 1968 throughout the jurisdiction of Local 30.   The brutality increased in direct proportion to the inability in the community to come to grips with the means to

control the fear and intimidation and put a stop to this unbridled
violence.   The reign of violence was an embarrassment to local
community leaders and local law enforcement who for a variety of
reasons were virtually powerless to stand in the way of the two fisted
baseball bat wielding regime.   It was only after the infliction of
widespread injury, property damage, the investment of hundreds of
thousands of dollars and hundreds of thousands of man hours on both
the state and federal law enforcement level coupled with the courageous
cooperation of a number of the individual victims that orderly court
proceedings brought this organization and its loyal followers down and
in many instances into prison.

Order dated July 7, 1998 C.A. 87-7718, pp. 1-2.

> D.     Miscellaneous Incidents

In 2002, the Philadelphia Inquirer reported on the plans of non-union developer PSDC,

Inc. to leave Philadelphia for the suburbs because of repeated union picketing.   See Nathan

Gorenstein, A Nonunion Developer, Picketed by Unions, Plans to Leave City, Phila. Inquirer,

Feb. 10, 2002, at A22.   PSDC executive vice president Mark Nicoletti told the Inquirer that

union members picketed and hung leaflets at his 8-year-old son's school, picketed the swim

club attended by his wife and children, and hired a plane to pull a banner along the New Jersey

shore with the slogan "No Nicoletti."   Id.   They also called Nicoletti's tenants and threatened

not to do business with them, compared Nicoletti publicly to Osama bin Laden, and arranged

for a comic brigade to march in the Mummer's Parade with a 12-foot-tall inflatable rat bearing

a "Nicoletti" banner.   Id. [4]

---

[4]  Peaceful efforts, including picketing, by unions to secure their members' employment have been successful. In
2004, in a highly publicized incident, the producers of the MTV series "The Real World" pulled out of
Philadelphia temporarily because of union picketing.   See Michael Klein, MTV Show Abandons Phila., Phila.
Inquirer, Mar. 17, 2004, at A1.   The producers had hired a non-union contractor to renovate the home where the
cast was to live.   Id.   For two weeks union members picketed the construction site, and the producers feared the
picketers would disrupt the show's filming.   Id.   The show's departure was short-lived; "The Real World"
returned to Philadelphia after the producers and unions reached a deal brokered by the mayor and governor.   See
Andrew Cassel, 'Real World' Return Doesn't Mean Phila. Has Changed Its Ways, Phila. Inquirer, Mar. 28, 2004,
at E1.

Another highly publicized incident occurred in 2007 during construction of the Comcast Tower in Philadelphia.   See Inga Saffron, Phila. No-Flush Standoff Unclogged, with a Catch, Phila. Inquirer, Apr. 5, 2006, at A1.   The developer of the building sought to have the new building certified as the tallest "green" building in the United States and wanted to install flushless urinals to save water.   Id.   However, the plumbers union and plumbing contractors blocked construction because the flushless urinals required less work to install.   Id.   After negotiations, the parties agreed to the installation of the flushless urinals, but the building also received a full-set of old-fashioned pipes installed by union plumbers that are not connected to anything.   Id.

In 2012, the conversion of the former Goldtex factory building in Center City Philadelphia into residences was the site of a well-publicized standoff between two young developers and the building trades unions. (Episode #3 in the Superseding Indictment).   See Steve Volk, The Brothers Who Busted Philly Unions. For Good., Phila. Magazine, Oct. 25, 2012; Inga Saffron, Changing Skyline, Phila. Inquirer, Aug. 9, 2012.   The Pestronks and their development company, Post Brothers, awarded non-union contractors 60 percent of the work and union contractors 40 percent.   Volk, supra.   The unions refused the work and began picketing the site.   Id.   Protesters handed out fliers, chanted, and marched, blocked delivery trucks, harassed non-union workers, poured oil across the site's entrance, planted nails to flatten truck tires, and made threats.   Id.   The Pestronks reported that they spent an additional $30,000 on security measures.   Saffron, Changing Skyline, supra.   The Pestronks also recorded the union tactics and posted photos and videos to an Internet site they created.   Volk, supra.

17

V.      **Impact of Union Violence**

Epidemics of union violence, as Philadelphia has periodically suffered, are a dark economic cloud hovering over what is otherwise a bright pasture for growth and prosperity. Similar to a Biblical plague, union violence has damaged the City's reputation and economy in major ways.

One concrete effect of diminished competition from non-union labor in Philadelphia's higher building costs in the city compared to the suburbs, where there is more non-union competition.   See The Last Union Town, Phila. Magazine, Jan. 21, 2008; Nathan Gorenstein, Building-Union Pay Far Higher in City Than in Suburbs, Phila. Inquirer, Aug. 12, 2001, at A1. Estimates are reported that building a home in Philadelphia costs one-third to one-half more than building the identical home in the suburbs.   The Last Union Town, supra; Gorenstein, Building-Union Pay, supra.   One developer testified before City Council in November 2007 that the cost of construction outside Philadelphia is $60-$75 per square foot, compared to $125 per square foot within the city.   The Last Union Town, supra.   Philadelphia-based labor unions reportedly have two separate wage scales for the suburbs and the city.   Gorenstein, Building-Union Pay, supra.   These higher building costs limit new home construction in Philadelphia and skew development into higher-end luxury buildings, according to Kevin Gillen of the Fels Institute of Government at the University of Pennsylvania.   Volk, supra.

In this City, with a high unemployment rate, where every new construction project is the proverbial "manna from heaven," i.e., a welcomed opportunity for new jobs, union members who threaten violence, and then commit violence, deter needed economic infusion. They are simply scourges of society. Just as they deter economic growth, the law must deter

them and others tempted to follow them.

## VI.     Summary of This Case

### A.      Summary of Charges and Guilty Pleas

| Count | Description | Defendants Charged | Guilty Pleas |
|---|---|---|---|
| **TABLE 1: Summary of Charges and Guilty Pleas in United States v. Dougherty, et al., No. 14-cr-69** | | | |
| 1 | RICO Conspiracy<br>18 U.S.C. § 1962(d)<br>(Episodes #1-25) | Joseph Dougherty (*)<br>Edward Sweeney<br>James Walsh<br>Francis Sean O'Donnell<br>Christopher Prophet<br>William Gillin<br>William O'Donnell<br>Richard Ritchie | Edward Sweeney<br>James Walsh<br>Francis Sean O'Donnell<br>Christopher Prophet (**)<br>William Gillin<br>William O'Donnell (**)<br>Richard Ritchie (**) |
| 2 | Violent Crime in Aid of Racketeering<br>18 U.S.C. § 1959<br>(Episode #1 – Toys R Us, King of Prussia assault) | Richard Ritchie | Richard Ritchie (**) |
| 3 | Malicious Damage by Means of Fire<br>18 U.S.C. § 844(i)<br>(Episode #2 – Quaker Meetinghouse arson) | Joseph Dougherty (*)<br>Edward Sweeney<br>James Walsh<br>William Gillin<br>Daniel Hennigar | Edward Sweeney<br>James Walsh<br>William Gillin<br>Daniel Hennigar |
| 4 | Use of Fire to commit a felony<br>18 U.S.C. § 844(h)<br>(Episode #2 – Quaker Meetinghouse arson) | Joseph Dougherty (*)<br>Edward Sweeney<br>James Walsh<br>William Gillin<br>Daniel Hennigar | Edward Sweeney<br>James Walsh<br>William Gillin |
| 5 | Malicious Damage by Means of Fire<br>18 U.S.C. § 844(i)<br>(Episode #6 – 4900 Grays Avenue arson) | Joseph Dougherty (*)<br>Edward Sweeney<br>James Walsh<br>William Gillin | Edward Sweeney<br>James Walsh<br>William Gillin |
| 6 | Use of fire to commit a felony<br>18 U.S.C. § 844(i)<br>(Episode #6 – 4900 Grays Avenue arson) | Joseph Dougherty (*)<br>Edward Sweeney<br>James Walsh<br>William Gillin | |

| | | | |
|---|---|---|---|
| **TABLE 1: Summary of Charges and Guilty Pleas in** _United States v. Dougherty, et al._, **No. 14-cr-69** | | | |
| *Count* | *Description* | *Defendants Charged* | *Guilty Pleas* |
| 7 | Conspiracy to maliciously damage by means of fire 18 U.S.C. § 844(n) (Episode #11 – Malvern attempted arson) | Joseph Dougherty (*) Edward Sweeney James Walsh William Gillin Francis Sean O'Donnell Greg Sullivan | Edward Sweeney James Walsh William Gillin Francis Sean O'Donnell Greg Sullivan |
| 8 | Attempt to maliciously damage by means of fire (Malvern) 18 U.S.C. § 844(i) (Episode #11 – Malvern attempted arson) | Joseph Dougherty (*) Edward Sweeney James Walsh William Gillin Francis Sean O'Donnell Greg Sullivan | James Walsh William Gillin Francis Sean O'Donnell |
| 9 | Extortion 18 U.S.C. § 1951 (Episode #1 – Toys R Us, King of Prussia) | Christopher Prophet Richard Ritchie | Christopher Prophet (**) Richard Ritchie (**) |
| 10 | Extortion 18 U.S.C. § 1951 (Episode #5 – Frank Bendinelli/31st and Spring Garden) | Joseph Dougherty (*) Edward Sweeney William O'Donnell | Edward Sweeney |

(*) After a jury trial, Defendant Joseph Dougherty was convicted of Counts 1, 5, 6, 7, 8, and 10. The Court granted Dougherty's motion for a directed verdict on Counts 3 and 4.

(**) Indicates a plea agreement, approval of which the Court has deferred until after it reviews the Defendant's presentence report, pursuant to Fed. R. Crim. P. 11(c)(3)(A).

| | | |
|---|---|---|
| **TABLE 2: Summary of Charges in Related Cases Brought by Informations to Which Defendants Pled Guilty** | | |
| *Case* | *Description of Charge* | *Defendant* |
| United States v. Bailey, No. 14-cr-435 | Extortion 18 U.S.C. § 1951 (Episode #6 – 4900 Grays Avenue) | Shawn Bailey |
| United States v. Sullivan, No. 14-cr-436 | Extortion 18 U.S.C. § 1951 (Episode #6 – 4900 Grays Avenue) | Greg Sullivan |

| TABLE 2: Summary of Charges in Related Cases Brought by Informations to Which Defendants Pled Guilty | | |
|---|---|---|
| United States v. Zinn, No. 14-cr-501 | Conspiracy to Commit Extortion 18 U.S.C. § 1951 (Episodes #1 – Toys R Us, King of Prussia, #14 – Merion East Golf Course, Ardmore, #15 – Vertical Screen, Warminster, #16 – Wallingford Elementary School, and #25 – CVS, Warrington) | James Zinn |

B.    Facts

These cases concern acts of extortion, arson, assault, and vandalism directed and committed by leaders and members of the Philadelphia ironworkers union, Ironworkers Local 401.   Defendants are twelve members of the union. Defendant Joseph Dougherty was the union's Business Manager-Financial Secretary-Treasurer, who was the most senior manager of the union's day-to-day operations. Four Defendants—Edward Sweeney, William O'Donnell, Francis Sean O'Donnell   ("Sean O'Donnell"), and Christopher Prophet — Business Agents responsible for generating work for union members, convincing contractors to hire union ironworkers, and assigning ironworkers to available jobs.   Dougherty, Sweeney, William O'Donnell, Sean O'Donnell, and Prophet all worked full-time for the union and were paid salaries by the union.   Defendant Richard Ritchie was a member of the union's executive board.   He and the remaining six Defendants—James Walsh, William Gillin, Daniel Hennigar, Greg Sullivan, James Zinn, and Shawn Bailey—were union members who worked on ironworking projects around the Philadelphia area.

Ten defendants (all except Zinn and Bailey) were charged in a Superseding Indictment that set out ten counts.   See Table 1, supra.   All of these defendants except Dougherty pled guilty to one or more of these counts. Id.   Dougherty went to trial and was convicted by a jury

on six of the counts with which he was charged.[5]   In addition, Zinn, Bailey, and Sullivan were each charged separately for related acts of extortion and each pled guilty.[6]   See Table 2, supra.

As for the ten defendants charged in the Superseding Indictment, in Count One, eight defendants (Dougherty, Sweeney, Walsh, Sean O'Donnell, Prophet, Gillin, William O'Donnell, and Ritchie) were charged with RICO Conspiracy in violation of 18 U.S.C. § 1962(d).   All pled guilty to this charge except Dougherty, who was convicted.   Count Two charged Ritchie with committing a violent crime—an assault on non-union workers with a baseball bat—in aid of racketeering; he pled guilty.

Counts Three, Four, Five, Six, Seven, and Eight charged various defendants with use of fire to commit a felony, malicious damage by means of fire, conspiracy to maliciously damage by means of fire, and/or attempt to maliciously damage by means of fire in connection with two completed arsons and one attempted arson that targeted building projects employing non-union ironworkers.   Sweeney, Walsh, Gillin, Hennigar, Sean O'Donnell, and Sullivan each pled guilty to one or more of these counts.   Dougherty was convicted on Counts Five, Six, Seven, and Eight.

Count Nine charged Prophet and Ritchie with extortion of a particular non-union contractor; both pled guilty.   Similarly, Count Ten charged Dougherty, Sweeney, and William O'Donnell with extortion of another non-union contractor.   Sweeney pled guilty to this charge and Dougherty was convicted.

---

[5] The Court granted Dougherty's motion for a directed verdict with respect to Counts 3 and 4, which related to acts of arson on the construction site for a Quaker Meetinghouse in Philadelphia.

[6] Of the eleven Defendants who pled guilty to one or more charges, seven of them—Gillin, Bailey, Walsh, Zinn, Sweeney, Hennigar, and Sean O'Donnell—cooperated with the government and testified during Dougherty's trial.

In sum, each Defendant pled guilty to or was convicted of one or more of the charges brought against him. See Tables 1 and 2, supra.   And at least one defendant pled guilty to or was convicted of each Count in the Superseding Indictment. Id. As such, the conduct charged in the indictment has been admitted by one or more Defendants themselves, or found by the jury that rendered the verdict against Dougherty, or both.

C.    The Specific Conduct Set Out in the Indictment

The Superseding Indictment described 25 episodes of extortion, attempted extortion, and arson that occurred over a span of about five years, from 2008 until October 2013.[7] Superseding Indictment ("SI") 16-27 (ECF 231).   During Dougherty's trial, the Government further labeled these episodes as follows:

> Episode #1 –    Toys R Us extortion and violent crime in aid of racketeering, King of Prussia
> Episode #2 –    Quaker Meetinghouse arson
> Episode #3 –    Post Brothers (12th and Wood) attempted extortion
> Episode #4 –    GTR/Planet Fitness extortion
> Episode #5 –    Frank Bendinelli (31st and Spring Garden) extortion
> Episode #6 –    4900 Grays Avenue arson
> Episode #7 –    Carpenters union attempted extortion (19th and Arch)
> Episode #8 –    AP Construction extortion (30th and Market)
> Episode #9 –    Ultimate Towers extortion
> Episode #10 – Fringe extortion (Race St and Columbus Ave)
> Episode #11 – Malvern attempted arson
> Episode #12 – La Colombe attempted extortion
> Episode #13 – Heritage Warrington Center attempted extortion
> Episode #14 – Merion East Golf Course attempted extortion
> Episode #15 – Vertical Screen, Warminster attempted extortion
> Episode #16 – Wallingford Elementary attempted extortion
> Episode #17 – Academy Park/Sharon Hill Elementary attempted extortion
> Episode #18 – Eddystone Firehouse attempted extortion
> Episode #19 – Family Dollar Yeadon attempted extortion
> Episode #20 – Endo Pharmaceuticals extortion (Atwater Drive, Malvern)
> Episode #21 – Solana Horsham attempted extortion
> Episode #22 – Agnes Irwin School extortion

---

[7] The actions charged in the related Informations are a subset of these 25 episodes.   See Table 2, supra.

Episode #23 – Planet Fitness Drexel Hill extortion
Episode #24 – Lowes Havertown, attempted extortion
Episode #25 – CVS Warrington, attempted extortion

Defendants' actions during these episodes fall into four general categories:

(1)    nighttime vandalism of non-union work sites, typically smashing anchor bolts with sledgehammers;

(2)    nighttime arsons and attempted arsons of non-union work sites using an acetylene torch;

(3)    property damage and physical assaults related to union picketing of particular construction sites; and

(4)    extortions using the threat of violence and vandalism to coerce contractors into hiring unwanted union labor.

Defendants referred to their nighttime vandalism and arson as "night work," and to the perpetrators as "shadow gangs."

(1)    Vandalism of Non-Union Construction Sites Using Non-Union Ironworkers

The Superseding Indictment sets out fourteen episodes in which Local 401 members destroyed anchor bolts or construction equipment at non-union construction sites throughout the Philadelphia region.   Anchor bolts are large bolts embedded in the concrete foundation of a building, to which structural iron pieces are attached.   Defendants' typical *modus operandi* was to break into construction sites at night and smash the anchor bolts with sledge hammers, bending them over and rendering them useless.   To repair this damage, the contractors and/or building owners were forced to expend significant amounts of time and money to either set new anchor bolts into the foundation or weld the structural steel to the remaining anchor bolt stubs, as well as hire engineers to oversee the process and ensure that the repaired building frame would still be structurally sound.   Defendants also sometimes damaged pieces of

24

construction equipment, such as vehicles and cranes, used by non-union ironworkers.

Defendants' anchor bolt destruction was widespread across the Philadelphia region and persistent, spanning at least five years and thirteen unique episodes that targeted contractors working on both public and private buildings.   In chronological order, the damaged properties included:

    a)  a commercial building (La Colombe warehouse) in Philadelphia (2008), SI 22 (Episode #12);

    b)  a commercial building (the Heritage Warrington Center) in Warrington (March 2009), SI 22 (Episode #13);

    c)  a golf course (Merion East) in Ardmore (December 2009), SI 22 (Episode #14);

    d)  a commercial building (Vertical Screen) in Warminster (March 2010), SI 22 (Episode #15);

    e)  a store (Toys R Us) in King of Prussia (May 28, 2010), SI 16, 28 (Episode #1);

    f)  an elementary school in Wallingford (October 2011), SI 23 (Episode #16);

    g)  a commercial building (Endo Pharmaceuticals) in Malvern (January 2012), SI 24-25 (Episode #20);

    h)  an elementary school in Sharon Hill (March 2012), SI 23-24, 29 (Episode #17);

    i)  an assisted living facility (Solana Horsham) in Horsham (April 2012), SI 25 (Episode #21);

    j)  a retail building (Family Dollar) in Yeadon (May 2012), SI 24 (Episode #19);

    k)  a commercial building (Planet Fitness) in Drexel Hill (October 2012), SI 26 (Episode #23);

    l)  a retail business (Lowes) in Havertown (November 2012), SI 26-27 (Episode #24); and

    m) a retail business (CVS) in Warrington (March 2013), SI 27 (Episode #25).

Notes recovered from Sean O'Donnell, and his testimony at Dougherty's trial, indicate

that he repeatedly described contractors running into "anchor bolt problems" and publicly thanked "the Shadow Gang" for a "job well done" at union meetings.   SI 23 (Episode #16, Wallingford elementary school), 23-24 (Episode #17, Sharon Hill elementary school), 24 (Episode #19, Family Dollar building in Yeadon), 24-25 (Episode #20, Endo Pharmaceuticals building in Malvern), 26-27 (Episode #24, Lowes building in Havertown).   His notes describe that the Sharon Hill elementary school contractor was delayed for a month because of the anchor bolt damage, and the Malvern site contractor was delayed by a week and incurred expenses of $150,000 to repair the anchor bolts.   SI 24-25. In the wake of this vandalism, the contractor in Malvern also relented and agreed to hire some union ironworkers.   SI 25.

In addition to damaging anchor bolts, defendants' "night work" sometimes targeted the construction equipment used by non-union ironworkers. For example, one or more defendants damaged:

a)  construction equipment at a golf course in Ardmore (December 2009), SI 22 (Episode #14);

b)  construction equipment at a commercial building in Warminster (March 2010), SI 22 (Episode #15);

c)  the control panel on a piece of construction equipment at a store in King of Prussia (May 2010), SI 16 (Episode #1);

d)  equipment at an elementary school in Wallingford (October 2011), SI 23 (Episode #16);

e)  equipment at a firehouse in Eddystone (sometime in 2012), SI 24 (Episode #18); and

f)  equipment including a crane at a retail business in Havertown (November 2012), SI 26-27 (Episode #24).

Like the anchor bolt damage, the vandalism of construction equipment caused contractors

and/or building owners to incur costs for repairs and delays.

        (2)    Nighttime Arsons and Attempted Arson at Non-Union Construction Sites

In 2012 and 2013, defendants added arson to their repertoire of "night work" activities. As some of the cooperating defendants testified during Dougherty's trial, smashing anchor bolts with sledgehammers only worked if the "shadow gangs" were able to vandalize a non-union construction site before non-union ironworkers erected the building's steel columns. Once the columns were erected and fastened to the anchor bolts, sledgehammers were ineffective. In these situations, some defendants turned to a portable acetylene torch that could cut through anchor bolts and steel columns.

The first arson occurred in December 2012 (Episode #2). On about December 17, 2012, Sweeney attempted to convince a contractor building a Quaker meetinghouse in the Chestnut Hill section of Philadelphia to use union ironworkers, but the contractor refused. SI 33. On the night of December 20, 2012, Hennigar drove Walsh and Gillin to the construction site. SI 16, 33-34. They used a portable acetylene torch owned by the union to cut some of the steel columns at the site and some of the anchor bolts fastening the columns to the foundation. In addition, they set fire to a crane that was being used for the ironwork. Id. Altogether, these actions caused approximately $500,000 in damage. SI 16. After this arson, Gillin and Walsh discussed ways to avoid being caught in the future, including turning off their cell phones and using two-way radios to communicate. SI 34.

A second arson occurred in July 2013, after Sweeney learned that non-union workers were erecting a storage building at 4900 Grays Avenue in Philadelphia. SI 37 (Episode #6). During Dougherty's trial, Walsh testified that Dougherty helped him find the union's portable

acetylene torch, which was corroborated by a wiretap in which the head of the apprentice school stated that "Joe gave out this other unit to this Jimmy Walsh to use one time." Dougherty Ex. 12 (Oct. 9, 2013 call from F. Marsh to E. Streckenbein).   Walsh arranged to refill the gas and oxygen tanks that fueled the torch and then, on the night of July 21, 2013, Walsh and Gillin used the torch to cut through some of the steel columns at the site.   SI 37, 39. The property owner, who had been using his own employees to erect the building, subsequently hired a union contractor to repair the damage and finish the construction.   SI 40.

Finally, in October 2013, Defendants learned of a large non-union construction project in Malvern. SI 21 (Episode #11). Walsh and Sean O'Donnell reconnoitered the location and Walsh, who had never returned the portable torch after the July 2013 arson, arranged to refill the gas and oxygen canisters and bought spare canisters as well. SI 21, 46-47. On the night of October 12, 2013, Sullivan drove Walsh and Gillin to the Malvern site, after receiving authorization from Sean O'Donnell to proceed.   SI 48.   Walsh and Gillin began to set up the torch but were arrested before any damage was done. SI 21.

(3)   Vandalism, Assaults, and Other Illegal Conduct Related to Picketing Activities

Defendants' illegal conduct was not confined to secretive "night work."   During daytime picketing, which could have been conducted legally, they regularly crossed the line into illegality by resorting to actions such as assaulting and intimidating non-union workers, blockading construction sites, and vandalizing equipment.

The Superseding Indictment listed numerous examples of this conduct, to which several defendants pled guilty and of which Dougherty was convicted.   For example, on June 23, 2010, Prophet and Ritchie participated in an assault on non-union workers at a construction

28

site in King of Prussia.   SI 16, 28, 49 (Episode #1).   Prophet had previously targeted the site

with "night work" that destroyed approximately 80 anchor bolts but, when that failed to

convince the contractor to hire union ironworkers, Ritchie attacked two non-union ironworkers

with a baseball bat.   SI 16, 28, 49.   Prophet then provided false information to police officers

investigating the assault.   SI 16, 28.

In the summer of 2012, the ironworkers and other unions were picketing a construction

company (Post Brothers) that was perceived to hire too few union workers.   SI 17 (Episode

#3). Sweeney threatened a company official that he would burn a crane if it was brought onto

the site to perform ironwork.   SI 17. Later that year, Walsh attempted to attack one of the

company's non-union employees with a crow bar, damaging the employee's vehicle. SI 17, 33.

Also in 2012, Ritchie and William O'Donnell identified a non-union contractor (AP

Construction) working in Philadelphia, and Ritchie threatened him with violence and

destruction of property if he continued to refuse to hire union ironworkers.   SI 19-20, 43-44

(Episode #8).   In August 2012, Sean O'Donnell organized a picket line at a school building in

Wynnewood.   SI 25 (Episode #22).   The ironworkers blockaded the site, preventing

non-union workers from accessing the site or delivering materials. SI 25, 31. Sean O'Donnell

subsequently reported at a union general meeting that the tactics had worked and the contractor

had agreed to hire two union ironworkers.   SI 26, 31-32.

In late May 2013, Sweeney and other picketing ironworkers employed similar tactics

against a non-union contractor working on a building in Philadelphia.   SI 17, 35 (Episode #4).

The picketers attempted to physically and forcibly prevent the contractor's employees from

accessing the site or delivering materials.   SI 17.   Union picketers put locks on the

construction gates, put superglue in the contractor's locks, put superglue in the locks of a

non-union construction van, and flattened a tire on the van by removing the valve stem. SI 17,

35.   Sweeney also used a knife to slash the tire of one of the contractor's vehicles.   SI 17, 35.

When the same contractor began working in Ridley in August 2013, Sean O'Donnell led

similar picketing tactics that eventually coerced the contractor into hiring two union members.

SI 17-18, 42-43.   After the contractor acquiesced, Dougherty agreed to Sean O'Donnell's

proposal to have the union pay for the damage that Sweeney had inflicted on the contractor's

vehicles. SI 43.

Also that summer, on July 29-30, 2013, Local 401 got into a heated dispute with the

carpenters union about which union had jurisdiction to install certain materials at a building

site at 19th and Arch Streets in Philadelphia.   SI 19, 40-42 (Episode #7).   In a series of phone

calls, William O'Donnell, Sweeney, and Dougherty agreed to have picketing ironworkers

physically obstruct the other union from unloading a truck by climbing onto the truck and

sitting on the construction materials.   SI 41.   Sweeney also encouraged William O'Donnell to

start a physical altercation with an official from the other union and called Ritchie and other

ironworkers to tell them to prepare for a street brawl with the carpenters.   SI 41-42.   During

the episode, Dougherty considered ordering all ironworkers in the entire city to join the

picketing, and Sweeney and William O'Donnell both stated that they were prepared to

maintain the obstructive picketing until they were arrested.   SI 41-42.   During a wiretapped

telephone call a month later, with disputes continuing, Sweeney expressed a desire to know

that he had terminal cancer so he would be free to "go there and shoot everybody."   SI 43.

In late September or October of 2013, Sweeney also learned of a non-union contractor

working at a construction site in Philadelphia.   SI 20-21, 45 (Episode #10).   He instructed

ironworkers to prevent the contractor from unloading materials and then coerced the contractor

into hiring a union ironworker and a member of another union.   SI 20-21, 45.   In so doing, he

acknowledged that the union workers did not even know how to do the work that was to be

performed.   SI 20-21, 45.

<blockquote>(4)    Extortion Using the Union's Reputation for Violence and Sabotage</blockquote>

Having established and repeatedly reinforced a reputation for violence and vandalism,

defendants were able to use their notoriety to extort non-union contractors into hiring union

ironworkers.   For example, in July 2013, Sweeney, William O'Donnell, and Dougherty

coordinated an effort to force a contractor (Frank Bendinelli) to use all union labor on an

ironworking project at 31st and Spring Garden Streets in Philadelphia.   SI 18, 36-39 (Episode

#5).   On July 12, 2013, Sweeney and William O'Donnell attempted to organize a blockade of

the construction gates at the site, but discovered that trucks and a crane had already been

delivered.   SI 36-37.   On July 13, 2013, Dougherty rejected both the contractor's proposal to

hire one union ironworker, and Sweeney's suggestion that the contractor hire two union

ironworkers.   SI 37-38.   Dougherty stated, in a wiretapped telephone call, that giving the

non-union workers even "one piece is too much," and threatened that if the building was

erected, he would rent a crane and the union would "tear[ ] it the f--- down in broad, in broad

daylight" and then "we'll load it out, rent the truck, and we'll steal the iron."   SI 38.   Sweeney

stated that the picketers would "do whatever we had to do" and that no one was wearing

"colors" or picket signs, "we were just there."   SI 38.   On July 15, 2013 Sweeney, Walsh, and

other ironworkers set up a picket line at the site that blocked both entrances.   SI 38.   William

O'Donnell and Sweeney spoke with the contractor, who offered to hire two union ironworkers and explained that he would not make any money if he had to hire unwanted and unneeded union workers.   SI 39.   Dougherty again rejected that offer, telling Sweeney "I'd tell him to go f--- his self."   SI 39.   The contractor finally relented out of fear for the safety of his workers and equipment, and the entire job went to a union-affiliated contractor.   SI 18.

In about September 2013, Dougherty was contacted by an out-of-state communications tower contractor who had heard of the union's reputation for sabotage and wanted to work out a deal before working in the Philadelphia area.   SI 20, 44 (Episode #9).   To prevent sabotage, the contractor agreed to hire two union ironworkers, even though only one of them, Walsh, had the necessary certification to work on the communications tower.   After a series of problems between Walsh and the non-union contractor, the contractor demanded to be able to fire Walsh, prompting Walsh and Sweeney to threaten the contractor with sabotage and assault. SI 46.   After the contractor sought Dougherty's intervention, he approved Walsh's firing and told Sweeney he did not want the site sabotaged. SI 20, 46.

D.   Ironworker Members' Incentives to Commit Illegal Acts

Not only were violence and property destruction condoned by Defendants, such methods were seen as a way to increase or maintain their positions within the union.   As elected leaders of the union, Dougherty, Sweeney, Prophet, William O'Donnell, and Sean O'Donnell had strong incentives to use whatever tactics were necessary to procure more work for the union's members, shore up the union's finances, and thereby stay in the good graces of the general membership.   Sweeney, Prophet, William O'Donnell, and Sean O'Donnell also exercised significant influence over other union members because they assigned ironworkers

32

to available jobs.

The rank-and-file union members who participated in violence and night work generally saw it as a way to get better job assignments and to move into leadership positions. Ritchie, already a member of the union's executive board, sought to raise his profile within the union to help him win election to business agent.   SI 12.   Gillin agreed to participate in night work to increase his position in the union.   SI 12.   To recruit Sullivan into night work, Walsh told him that it would be good for his career.   SI 46-47.   Walsh himself sought to use his night work to curry favor with the union members and leaders, with the ultimate aspiration of joining the union's executive board or board of trustees.   SI 10.   Walsh's understanding, that night work led to favorable treatment, was confirmed when a seat on the board of trustees opened up. SI 44.   Although the seat was given to Zinn (who also did night work), during a wiretapped telephone call the union president reassured Walsh that he knew what Walsh was doing for the union, that Sweeney had spoken up on Walsh's behalf, and that Walsh should not get discouraged.   SI 44.

In all, the charges to which nine Defendants have pled guilty and the evidence put forth during Dougherty's trial paint a picture of union leaders and members who routinely encouraged and rewarded violence, intimidation, and vandalism directed against non-union contractors.   Dougherty summed up this view of non-union workers on a wiretapped telephone call in which he stated, "You should be able to do whatever you want to them and it should be legal."   Dougherty Ex. 56 (November 5, 2013 call between E. Strechenbein and J. Dougherty).

**VII.   Conspiracy**

For centuries, the common law has treated conspiracies, agreements to conduct crime jointly, as particularly serious.   One obvious reason is that multiple actors committing crimes in concert are likely to commit more criminal acts, and/or more serious crimes, than a single individual acting alone.   The indictment charged Defendants with two counts of conspiracy: conspiracy to commit arson in violation of 18 U.S.C. § 844(n), and conspiracy to violate the Racketeer Influenced and Corrupt Organizations ("RICO") Act under 18 U.S.C. § 1962(d).   A conspiracy requires "(1) a unity of purpose between the alleged conspirators; (2) an intent to achieve a common goal; and (3) an agreement to work together toward that goal."   United States v. Pressler, 256 F.3d 144, 149 (3d Cir. 2001) (citing United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999)).   The government may prove each element of a conspiracy solely through circumstantial evidence.   United States v. Kapp, 781 F.2d 1008, 1010 (3d Cir. 1986).

The third element, that the parties agreed "to commit some other crime beyond the crime constituted by the agreement itself," is the "sine qua non of the" offense.   United States v. Tyson, 653 F.3d 192, 206 (3d Cir. 2011) (quoting United States v. Gibbs, 190 F.3d 188, 197 (3d Cir. 1999); United States v. Kozinski, 16 F.3d 795, 808 (7th Cir. 1994)) (internal quotation marks omitted).   Conspiracy and the underlying substantive offense, however, are separate crimes, and "the illegality of the agreement does not depend on the achievement of its end." United States v. Salahuddin, 765 F.3d 329, 341 (3d Cir. 2014) (quoting Iannelli v. United States, 420 U.S. 770, 777 (1975)).   A defendant is therefore not required to complete the crime, but rather "to facilitate only some of the acts leading to the substantive offense." Salinas v. United States, 522 U.S. 52, 65 (1997).

The intent required to sustain a conspiracy conviction is not present unless a defendant has knowledge of both the agreement's "illicit purpose" and the "facts that constitute the offense." United States v. Brodie, 403 F.3d 123, 148 (3d Cir. 2005). The requisite "'knowledge' can be demonstrated by actual knowledge or willful blindness." United States v. Caraballo-Rodriguez, 726 F.3d 418, 425 (3d Cir. 2013) (citing Brodie, 403 F.3d at 148). A defendant may nevertheless be convicted when his or her co-conspirators' identities are unknown and without knowing "all of the details of the conspiracy." United States v. Obialo, 23 F.3d 69, 72 (3d Cir. 1994); United States v. Riccobene, 709 F.2d 214, 225 (3d Cir. 1983), overruled on other grounds by Griffin v. United States, 502 U.S. 46 (1991). Likewise, throughout the existence of the conspiracy, a defendant will be liable for the acts of his or her co-conspirators so long as they are reasonably foreseeable and committed "in furtherance of [the] conspiracy." Smith v. United States, __ U.S. __, __, 133 S. Ct. 714, 719 (2013); United States v. Lopez, 271 F.3d 472, 480 (3d Cir. 2001) (quoting Pinkerton v. United States, 328 U.S. 640, 647–48 (1946)).

Of course, "illegal agreements are rarely, if ever, reduced to writing or verbalized." United States v. McKee, 506 F.3d 225, 238 (3d Cir. 2007). As is more often the case, an agreement between co-conspirators and their knowledge of the group's illicit goals will be established by a cooperating co-conspirator, or if none, must be demonstrated through circumstantial evidence or by showing their "activities could not have been carried on except as the result of a preconceived scheme or common understanding." United States v. Pressler, 256 F.3d 144, 149 (3d Cir. 2001) (quoting Kapp, 781 F.2d at 1010) (internal quotation marks omitted). Such inferences "must bear a 'logical or convincing connection to established

fact.'"   Caraballo-Rodriguez, 726 F.3d at 425 (quoting United States v. Cartwright, 359 F.3d 281, 291 (3d Cir. 2004)).   Nevertheless, while insufficient alone to sustain a conviction, "conduct that furthered the purpose of the conspiracy," the "conspirator's stake in the venture," or "attempts to evade law enforcement" can give rise to an inference of knowledge of or agreement to an illicit goal.   McKee, 506 F.3d at 241–43.   A defendant's professed beliefs or association with a group is also probative of his or her state of mind even though they would be, standing alone, an impermissible basis for conviction.   United States v. Fullmer, 584 F.3d 132, 156 (3d Cir. 2009); McKee, 506 F.3d at 241–43.

Although § 1962(d) "broadened conspiracy coverage by omitting the requirement of an overt act," RICO conspiracy cases are otherwise governed by the above "well-established principles" of conspiracy law.[8]   Salinas v. United States, 522 U.S. 52, 63–64 (1997).   In a RICO conspiracy case the government must show:   "(1) that two or more persons agreed to conduct or to participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity; (2) that the defendant was a party to or member of that agreement; and (3) that the defendant joined the agreement or conspiracy knowing of its objective to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity."   United States v. John-Baptiste, 747 F.3d 186, 207 (3d Cir. 2014).   Consistent with general principles of conspiracy law, a defendant may be convicted of RICO conspiracy under § 1962(d) even if a substantive RICO violation

---

[8]    The Salinas Court concluded that Congress did not intend to require proof of an overt act for a RICO conspiracy conviction because the statute did not include language requiring an "act to effect the object of the conspiracy."   Salinas v. United States, 522 U.S. 52, 63 (1997).   18 U.S.C. § 844(n), the conspiracy to commit arson provision, likewise does not include this phrase.   In this case, defendants Sweeney, Walsh, Sullivan, Gillin, and Sean O'Donnell pled guilty to conspiracy to commit arson, and the jury returned a verdict against defendant Dougherty on this charge.   The government, however, clearly established at the Dougherty trial that overt acts were committed in furtherance of this conspiracy.

under § 1962(c) is never completed.    Id. at 65.    The defendant need only "intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive" violation of § 1962(c).    These elements are:

> (1) the existence of an enterprise affecting interstate commerce;
>
> (2) that the defendant was employed by or associated with the enterprise;
>
> (3) that the defendant participated in, either directly or indirectly, in the conduct or the affairs of the enterprise; and
>
> (4) that he or she participated through a pattern of racketeering activity .

United States v. Irizarry, 341 F.3d 273, 285 (3d Cir. 2003) (quoting United States v. Console, 13 F.3d 641, 652–53 (3d Cir. 1993)).

The predicate acts establishing a "pattern of racketeering activity" under § 1962(c) may themselves be conspiracies.    Id. at 293 n.7.    A substantive RICO charge may encompass "a series of different conspiracies . . . so long as all of the different conspiracies relate to the affairs of a single enterprise."    Id.    The predicate conspiracies and the RICO conspiracy, however, are "distinct offenses with entirely different objectives"—one aims to "assist the enterprise's involvement in corrupt endeavors," and the other is "confined to the commission of a particular substantive offense."    Id. (quoting United States v. Pungitore, 910 F.2d 1084, 1135 (3d Cir. 1990)).    As a result, while a defendant need not separately assent to the conspiracy to commit a predicate offense to remain part of the RICO conspiracy, a defendant's membership in the conspiracy to commit a predicate offense does not necessarily implicate him in the RICO conspiracy.    Id.

## VIII.    Arson and Malicious Burning

The federal government criminalized arson and malicious burning largely through the

Anti-Arson Act of 1982, Pub. L. No. 97-298, 96 Stat. 1319 (1982).   Pursuant to this legislation, arson offenses affecting interstate commerce were brought into the federal criminal code along with certain explosives offenses under 18 U.S.C. § 841 et seq., which also imposes mandatory minimums for arson and explosives offenses.

The federal explosives control statute, 18 U.S.C. § 844(h)(1), proscribes the use of "fire or an explosive to commit any felony which may be prosecuted in a court of the United States." Under § 844(h)(1), the government must prove that (1) the defendant committed a felony for which he may be prosecuted in a court of the United States; and (2) the defendant used fire to commit that felony.   See United States v. Hughes, No. 10-190, 2011 WL 2747574, at *1 (M.D. Pa. July 12, 2011) (incorrectly referring to § 844(h)(2)).   There is no Third Circuit case interpreting this provision.   However, the Fourth Circuit has held that § 844(h)(1) incorporates the elements of the predicate felony.   United States v. Martin, 523 F.3d 281, 292 (4th Cir. 2008).   "The 'use' of fire covered by this provision is not limited to arson and encompasses, for example, the use of fire to intimidate or threaten another person."   Id. at 288 (citation omitted).[9]

The primary federal arson statute, 18 U.S.C. § 844(i), provides that "[w]hoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce shall be imprisoned for not less than 5 years and not more than 20 years."   A conviction under § 844(i) requires proof of the following elements:   (1) that the defendant used fire or an explosive to damage or

---

[9] Other circuits have imposed certain limitations on the scope of 18 U.S.C. § 844(h) based on factors not present in this case.   See, e.g., United States v. Thompson, 728 F.3d 1011, 1016 (9th Cir. 2013); United States v. Colvin, 353 F.3d 569, 576 (7th Cir. 2003) (en banc).

38

destroy property; (2) that the defendant acted maliciously; and (3) that the property was used in or affected interstate commerce.   United States v. Minerd, 112 F. App'x 841, 845 (3d Cir. 2004) (not precedential), cert. denied, 543 U.S. 1175 (2005); United States v. Kerr, No. 3-2007-3, 2008 WL 1711412, at *2 (W.D. Pa. Apr. 11, 2008).

Section 844(i) does not define the term "maliciously."   In a non-precedential decision, the Third Circuit adopted the common law definition of the term and held that "one acted 'maliciously' if he or she acted intentionally or with willful disregard of the likelihood that damage or injury would result."   Minerd, 112 F. App'x at 845 (citing United States v. Gullett, 75 F.3d 941, 947 (4th Cir. 1996)).   But see United States v. McBride, 724 F.3d 754, 759 (7th Cir. 2013) ("For the federal arson statute to make sense, 'maliciously' has to mean deliberately (or in willful disregard of known or suspected consequences) using fire *to do a harmful act*.").

With regard to the interstate commerce element of the statue, the Supreme Court held in Jones v. United States, 529 U.S. 848, 854 (2000), that Congress did not "invoke its full authority under the Commerce Clause" in enacting § 844(i) and that the "key" words are "the qualifying words 'used in' a commerce-affecting activity."   By its terms, the statute applies only to property that is "used" in interstate commerce or in an activity that affects interstate commerce.   Id.   "That qualification is most sensibly read to mean active employment for commercial purposes, and not merely passive, passing, or past connection to commerce."   Id. at 855.   The proper inquiry "is into the function of the building itself, and then a determination of whether that function affects interstate commerce."   Id. at 854-55 (internal quotation marks and citation omitted).   The text of § 844(i) "suggests two methods by which a building can fall within section 844(i)'s interstate commerce element: the commercial function of the property

could directly inject it into the stream of interstate . . . and/or the building's functions could cause it to be used in an activity affecting interstate commerce."   United States v. Davies, 394 F.3d 182, 192-93 (3d Cir. 2005) (quoting United States v. Rea, 300 F.3d 952, 961 (8th Cir. 2002)).

Although the Third Circuit has yet to rule on the issue, other circuits have concluded that a defendant can be convicted under both § 844(h)(1) and § 844(i) because the elements of the offenses differ.   See, e.g., United States v. Patel, 370 F.3d 108, 115-16 (1st Cir. 2004); Martin, 523 F.3d at 292.

Under 18 USC § 844(n), a defendant who conspires to commit any offense contained in Title 18, Chapter 40 of the U.S. Code is subject to the same penalties that would have been imposed for the commission of that offense.

## IX.    Extortion

Under the Hobbs Act, "[w]hoever in any way or degree obstructs delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section" is punishable by up to 20 years imprisonment.   18 U.S.C. § 1951(a).

The Hobbs Act "unquestionably expanded" the common-law definition of extortion. Evans v. United States, 504 U.S. 255, 261 (1992).   In doing so, "Congress intended to broaden the scope of the Anti–Racketeering Act [of 1934] and was concerned primarily with distinguishing between 'legitimate' labor activity and labor 'racketeering,' so as to prohibit the latter while permitting the former."   Id. at 262-63. Congressional supporters of the Hobbs Act

"argued that its purpose was to end the robbery and extortion that some union members had engaged in, to the detriment of all labor and the American citizenry." Id. at 263. Subsequent Supreme Court decisions have clarified that, although the Hobbs Act "does not apply to the use of force to achieve legitimate labor ends," it does apply to unions' "wrongful" taking of property, for example, by using "the proscribed means to exact 'wage' payments from employers in return for 'imposed, unwanted, superfluous and fictitious services' of workers." United States v. Enmons, 410 U.S. 396, 400-01 (1973).

"Extortion" is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." Id. § 1951(b)(2). "Commerce" is defined as "commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction." Id. § 1951(b)(3).

To support a conviction under the Hobbs Act, the Government was required to prove (1) that the defendant induced his victim to part with property; (2) that the defendant did so by extortionate means; and (3) that interstate commerce was affected. United States v. Traitz, 871 F.2d 368, 390 (3d Cir. 1989) (citations omitted). The Third Circuit has also formulated the elements of the crime as a two-part test, holding "that a conviction under the Hobbs Act requires proof beyond a reasonable doubt that (1) the defendant knowingly or willfully committed, or attempted or conspired to commit, robbery or extortion, and (2) the defendant's conduct affected interstate commerce." See, e.g., United States v. Powell, 693 F.3d 398, 401

41

(3d Cir. 2012) (citations omitted).   This is a distinction without a difference, as the definition of "extortion" in the statute requires the obtaining of property from another.   It is also well settled that the Hobbs Act prohibits attempted extortion, and the "inducement to part with property" element is satisfied by an attempt to induce a victim to part with property.   Traitz, 871 F.2d at 393.

The Traitz defendants did not challenge, and the Third Circuit affirmed, the district court's recitation of the elements of extortion in violation of the Hobbs Act as (1) that defendants induced or attempted to induce others to part with their property; (2) that defendants did so with the victims' consent, but that this consent was compelled by the wrongful use or threat of force, violence, or fear; (3) that interstate commerce or an item moving in interstate commerce was delayed, obstructed, or affected in any way or degree; and (4) that defendants acted knowingly and willfully.   Id. at 380-81.

The Third Circuit rejected one defendant's contention that the government failed to show that there was an effect on interstate commerce.   "This Court has recognized that 'Congress intended, by enacting the Hobbs Act, to punish interference with interstate commerce to the fullest extent possible under its constitutional power.'"   Id. at 390 (quoting United States v. Mazzei, 521 F.2d 639, 642 (3d Cir. 1975) (en banc), cert. denied, 423 U.S. 1014 (1975)).   "[T]he impact on interstate commerce necessary to satisfy the Hobbs Act . . . is de minimis."   Id.   The impact on interstate commerce may also be positive or beneficial to commerce.   Id.   Moreover, all that is required is proof of a "potential" effect on interstate commerce.   United States v. Urban, 404 F.3d 754, 765 (3d Cir. 2005) (citing United States v. Haywood, 363 F.3d 200 (3d Cir. 2004)).

In <u>Traitz</u>, the Third Circuit found the interstate commerce element was satisfied by the fact that the Roofers Union and its affiliated benefit plans were interstate entities, so if the Union's extortion plans had succeeded, the Union would have had more money to provide benefits to union members in several states.  <u>Traitz</u>, 871 F.2d at 391.  The Third Circuit has also adopted a "depletion of assets" theory, under which the interstate commerce element may be satisfied by proof that a person or entity engaged in interstate commerce suffered depletion of its assets through extortion.  <u>See, e.g.</u>, <u>Urban</u>, 404 F.3d at 763-67 (discussing cases adopting and applying this theory).

The Third Circuit in <u>Traitz</u> also rejected a defendant's argument that the government failed to prove a nexus between fear and a victim's payments to the union.  "It is well settled that the element of 'fear' required for the Hobbs Act can be satisfied by placing a person in apprehension of economic loss."  <u>Traitz</u>, 871 F.2d at 391 (quoting <u>United States v. Agnes</u>, 753 F.2d 293, 302 n.15 (3d Cir. 1985)).  To determine if a purported victim was put in fear of economic loss, the evidence needs to establish that the victim reasonably believed (1) that the defendant had the power to harm the victim and (2) that the defendant would exploit that power to the victim's detriment.  <u>Id.</u> (citing <u>United States v. Capo</u>, 817 F.2d 947, 951 (2d Cir. 1987) (en banc)).

The Third Circuit also held in <u>Traitz</u> that in order to be convicted of Hobbs Act extortion, the defendant need not personally demand the property of another or be present when such a demand is made.  <u>Id.</u> at 395.  "[W]here the crimes of extortion follow a similar pattern and the alleged extortionist has knowledge of this pattern, it is unimportant that [he] did not personally demand money or actually hear the demand."  <u>Id.</u> (citations omitted).

Finally, in order to violate the Hobbs Act, a defendant must not only deprive another of property, but also must acquire or attempt to acquire that property.   See United States v. Salahuddin, 765 F.3d 329, 341 n.5 (3d Cir. 2014) (citing Scheidler v. Nat'l Org. for Women, Inc., 537 U.S. 393 (2003)).   In Salahuddin, the Third Circuit noted that the property rights at issue in that case—a business, charitable contributions, and money—were all capable of being acquired and presented no obstacle to a conviction under the Hobbs Act.   Id.   In Sekhar v. United States, 133 S. Ct. 2720, 2725 (2013), however, the Supreme Court concluded that attempting to compel the general counsel of the New York State Comptroller's office to recommend a particular investment was not extortion because the general counsel's recommendation was not transferable property.   The Court noted that at common law, "[e]xtortion required the obtaining of items of value, typically cash, from the victim."   Sekhar, 133 S. Ct. at 2725.   "The property extorted must therefore be *transferable*—that is, capable of passing from one person to another."   Id.

## X.    Aiding and Abetting

The federal aiding and abetting statute, 18 U.S.C. § 2, "reflects a centuries-old view of culpability:   that a person may be responsible for a crime he has not personally carried out if he helps another to complete its commission."   Rosemond v. United States, 134 S. Ct. 1240, 1245 (2014).   Under the statute:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2.

The general aiding and abetting statute, applicable to all federal criminal offenses, "decrees that those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime."   Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, 511 U.S. 164, 181 (1994) (citation omitted).   To establish a violation of § 2, the Government must prove:   "(1) that the substantive crime has been committed; and (2) that the defendant charged with aiding and abetting knew of the commission of the substantive offense and acted with the intent to facilitate it."   United States v. Huet, 665 F.3d 588, 596 (3d Cir. 2012) (quoting United States v. Peterson, 622 F.3d 196, 208 (3d Cir. 2010)).   The second element of the crime, in turn, consists of two elements:   (1) an affirmative act in furtherance of the substantive offense and (2) the intent of facilitating the offense's commission.   Rosemond, 134 S. Ct. at 1245.

The "act" element does not require that a criminal defendant participate in each and every element of the offense.   Id.   "In proscribing aiding and abetting, Congress used language that 'comprehends all assistance rendered by words, acts, encouragement, support, or presence,' . . . even if that aid relates to only one (or some) of a crime's phases or elements."   Id. at 1246-47 (citation omitted).   The importance of the aid rendered is irrelevant.   Id. at 1247.

The "intent" element of aiding and abetting generally requires the intent "go to the specific and entire crime charged," not some different or lesser offense.   Id. at 1248; see also Peterson, 622 F.3d at 208 ("The government must also prove that the defendant had the specific intent of facilitating the crime . . . mere knowledge of the underlying offense is not sufficient for conviction." (quoting United States v. Gordon, 290 F.3d 539, 547 (3d Cir. 2002)).   "To aid and abet a crime, a

defendant must not just in some sort associate himself with the venture, but also participate in it as in something that he wishes to bring about and seek by his action to make it succeed."   Rosemond, 134 S. Ct. at 1248 (internal quotation marks and citation omitted).   "Specific intent requires not simply the general intent to accomplish an act with no particular end in mind, but the additional deliberate and conscious purpose of accomplishing a specific and prohibited result."   Peterson, 622 F.3d at 208 (quoting Pierre v. Att'y Gen., 528 F.3d 180, 189 (3d Cir. 2008)).

The Supreme Court has "found that intent requirement satisfied when a person actively participates in a criminal venture with full knowledge of the circumstances constituting the charged offense."   Rosemond, 134 S. Ct. at 1248-49.   "What matters for purposes of gauging intent and so what jury instructions should convey, is that the defendant has chosen, with full knowledge, to participate in the illegal scheme—not that, if all had been left to him, he would have planned the identical crime."   Id. at 1250.

## XI.    Conclusion

In each defendant's sentencing, the Court will give due weight to each individual's personal and relevant involvement in the crimes documented in the Superseding Indictment and Information, their relative culpability, any cooperation, and presentations made by each defendant and his counsel.   Deterrence will be an important factor – the opportunity to deter future crimes is an opportunity too important to ignore.

**BY THE COURT:**

*/s/ Michael M. Baylson*
_____
**MICHAEL M. BAYLSON, U.S.D.C.**

O:\Criminal Cases\14-69 us v dougherty\14cr69.memo.sentencing.3.10.15.docx