IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>     v.<br><br>JOSEPH DOUGHERTY | CRIMINAL ACTION<br><br>NO. 14-69-1 |

**Baylson, J.**                                                                                                                              **July 16th , 2015**

### MEMORANDUM RE: POST-TRIAL MOTION

> Who finds the heifer dead and bleeding fresh,
> And sees fast by a butcher with an axe,
> But will suspect 'twas he that made the slaughter?
>
> --Shakespeare, Henry VI, Pt. II, Act III, Scene 2

Shakespeare's prescient verse encapsulates the role of circumstantial evidence as a basis of criminal responsibility. Defendant Joseph Dougherty, business manager of Local 401 of the Ironworkers Union, was convicted of six counts of RICO conspiracy, maliciously damaging property by arson, and extortion which interferes with interstate commerce. Principally through the testimony of cooperating defendants and intercepted telephone conversations, the government presented largely circumstantial evidence that Dougherty, although not personally committing any act of arson or violence, had knowledge of, encouraged, and approved multiple acts of sabotage against businesses employing non-union ironworkers.

Dougherty has filed a post-trial motion for judgment of acquittal on Counts V, VI, VII, VIII, and X, and/or for a new trial on all Counts (ECF 375). After briefing, the Court will **DENY** the motion.

1

I.      **Procedural History**

Dougherty was indicted on eight Counts for extortion, RICO conspiracy, and arson crimes arising out of his conduct as Business Manager of the Ironworkers Local 401 union. A jury trial on all these Counts began on January 5, 2015.  At the close of the government's evidence, the Court granted defendant's motion for acquittal as to Counts III and IV relating to an arson at the Quaker Meetinghouse in Chestnut Hill, Philadelphia.  The defendant presented certain character witnesses but otherwise did not present any substantive evidence.  The jury convicted defendant of the remaining six Counts.  On March 31, 2015, this Court filed a lengthy Memorandum (ECF 421) detailing the history of union violence in Philadelphia and summarizing the charges and criminal conduct alleged in this case.[1] United States v. Dougherty, --- F. Supp. 3d ----, No. 14-cr-69, 2015 WL 1455908 (E.D. Pa. Mar. 31, 2015). The Memorandum was a precedent to the sentencings of the other 11 defendants, stemming from the indictment in this case and three related indictments, all arising out of the same long-running criminal conduct by the Philadelphia Ironworkers union.

II.     **Motion for New Trial**

Dougherty's motion for a new trial is confined to two issues relating to the jury.

A.      **Jury Voir Dire**

Dougherty asserts that the Court erred by denying a request to excuse Juror Number 12. Juror 12 testified that two of her friends are friends with Robert O'Neill, who was involved with O'Neill Properties Group, which the government identified during the first day of testimony as one of the intended "victims" in this case. Tr. 1/5/2015 at 164:19, 174:7, 176:12, 178:11, 180:19

---

[1] The March 31, 2015 Memorandum includes a detailed description of all the criminal conduct and incidents charged in the superseding indictment, and further described during Dougherty's trial. Memo. at 19-33. This background information is not repeated in this Memorandum.

2

(references to O'Neill Properties Group during testimony of Special Agent Dimario); Tr. 1/6/2015 at 3:6 – 13:10 (colloquy with Juror 12).[2] Juror 12 did not know anything about the case, had never met O'Neill, did not know his first name, and did not know anything concerning his connection with the case. Tr. 1/6/2015 at 4:24 – 5:22, 6:14-16 (ECF 469) (colloquy with Juror 12). Dougherty did not dispute that O'Neill Properties Group was an intended victim. Id. 9:22 – 10:3 (colloquy with counsel). Although Juror 12 initially equivocated as to whether she could be fair and impartial, after several questions from the Court to determine whether she could in fact be fair and impartial, Juror 12 said that she could be and the request to excuse the juror was taken under advisement. Id. 10:6-13, 11:8-15 (colloquy with Juror 12 and counsel). At the conclusion of the trial, Dougherty's renewed request to excuse Juror 12 was denied because O'Neill's relationship to the case was fleeting and Juror 12's relationship to O'Neill was remote. Tr. 1/13/2015 at 194:8 – 198:20 (colloquy with counsel).

As the evidence turned out, O'Neill's company was not a "victim" in this case, but was a real estate developer for a property where a contractor using non-union labor was targeted for damage by several of the defendants. Tr. 1/5/2015 at 164:19-22 (testimony of Special Agent Dimario). The actual target of the scheme was not O'Neill's company, but rather an ironworking contractor named Paul Van Skovich. Tr. 1/12/2015 at 78:12 – 79:17, 98:20 – 99:1 (testimony of Sean O'Donnell). In any event, there never was any damage to this property. The scheme was never carried out because two of the other defendants in this case, who were going to carry out the scheme, were arrested before any sabotage was carried out. Tr. 1/5/2015 at 176:24 – 177:15 (testimony of Special Agent Dimario). These two defendants, James Walsh and William Gillin, pled guilty in this case. Thus, the totality of the evidence showed that O'Neill had no role in the

---

[2] The trial transcript is not consecutively paginated so citations to trial testimony include the date of the testimony and the page and line numbers.

case except that "O'Neill Properties Group" was mentioned six times during the trial as the developer of the property in Malvern that was targeted with an unsuccessful attempted arson. Tr. 1/5/2015 at 164:19, 174:7, 176:12, 178:11, 180:19 (testimony of Special Agent Dimario); Tr. 1/12/2015 at 98:20-23 (testimony of Sean O'Donnell).

### B. Dismissal of Juror During Deliberations

Dougherty also moves for a new trial because the Court "refused to dismiss a juror who refused to deliberate." Mot. at 2. On the second full day of jury deliberations, the Foreperson sent a note that "We have yet to come to any conclusions and appear to be at a stalemate. One person appears to be making decision [sic] based on life experience/religion as opposed to the evidence." After discussing the matter with counsel, the Court called the jury in and gave a short instruction about the jury's duty to deliberate as follows:

> . . . I've shared the note that the foreperson just gave me with counsel, but I'm not going to read it into the record at this time.
>
> I want to just say this in response. Each of you took an oath as jurors. You also took an oath when you were members of a panel that was brought in here with approximately 75 people. And we asked questions under oath and you were given an opportunity to raise your hand if there was any reason that you would not be able to decide the case based on the evidence and the law to be a fair and impartial juror. Those were very important questions that are asked and the response is -- or the lack of response reflects your oath as a member of the panel.
>
> Then when you were sworn in as a jury you were also sworn to be fair and impartial jurors and to decide the case on the evidence and the law and my instructions to you were including that, that you -- you must deliberate. Deliberation on the evidence and the law is part of your obligation as jurors and each of you have to do that.
>
> Now, I don't -- it's not my function to manage deliberations in any way, shape or form, but I presume at some point that you will go around the room and each of you gets a chance to express your views on the case which you not only should do, you must do.
>
> If it comes to your turn you need to discuss the evidence and the law and you also must follow my instructions. That's not up to your personal choice. Part

of your oath as jurors is to follow the instructions on the law that I gave you. Okay. And part of those is that you must deliberate and discuss the evidence.

Now, the ultimate question here is after considering the evidence and the law has the Government proved the defendant guilty beyond a reasonable doubt as to the essential elements of the six counts that are before you? And that is what you should be expressing your views about. That is an obligation you have.

So, Mr. Foreman, I'm going to ask you to -- all the jurors to retire again and keeping in mind what I just said, if the situation continues I instruct you to write another note to that effect and we'll then reconvene the jury. Okay.

All right. So the jury's excused and we'll be available if there are any further questions, but please follow what I just said. Thank you.

Tr. 1/15/2015 at 13:16 – 15:8.

The defendant did not take any exception to this supplemental charge.

### C.    Legal Standard and Discussion

The law is clear that the Court did not err in denying the request to excuse Juror 12 and did not err in its supplemental charge to the jury.

The Sixth Amendment guarantees "an impartial jury" which "consists of nothing more than jurors who will conscientiously apply the law and find the facts." United States v. Jones, 566 F.3d 353, 358 (3d Cir. 2009) (quoting Lockhart v. McCree, 476 U.S. 162, 178 (1986)) (emphasis and internal quotation marks omitted). "Voir dire is conducted under the supervision of the trial court and is left to its sound discretion." Id. (quoting United States v. DePeri, 778 F.2d 963, 971-72 (3d Cir.1985)). Such discretion is necessary because a district judge "must reach conclusions as to [juror] impartiality and credibility by relying on [his or her] own evaluations of demeanor evidence and of responses to questions." United States v. Cunningham, 694 F.3d 372, 393 (3d Cir. 2012) (quoting Rosales–Lopez v. United States, 451 U.S. 182, 188 (1981)). To show an abuse of that discretion, a defendant must "demonstrate[] clearly that the

juror[] possessed such fixed opinions that [he or she] could not judge impartially the guilt of the defendant." Jones, 566 F.3d at 358 (quoting DePeri, 778 F.2d at 972).

Here, Juror 12 had knowledge of O'Neill through mutual friends, but had never met him and never talked with her friends about the case. Tr. 1/6/2015 at 4:24 – 5:22 (colloquy with Juror 12). O'Neill was not a witness and his company was never actually victimized. Although Juror 12 expressed some initial reservations about her ability to set aside her knowledge of O'Neill, she testified that she could decide the case based exclusively on what happens in the courtroom and that the mere fact that O'Neill's company was an intended victim would not prevent her from being a fair and impartial juror. Id. 8:9-16; 10:10-13. These facts do not show that Juror 12 had "such fixed opinions that [she] could not judge impartially the guilt of the defendant." Jones, 566 F.3d at 358 (quoting DePeri, 778 F.2d at 972). In a similar prior case where a juror realized that she knew people connected to the case after the trial was underway, the Third Circuit affirmed a district court's conclusion that a juror's impartiality was not affected by her "incidental acquaintanceships" with the fiancée of the president of the victimized bank, the wife of a government witness, and the son of the United States Attorney. United States v. Abuhouran, 162 F.3d 230, 234 (3d Cir. 1998).[3]

As for the issue related to the jury note, the Third Circuit has held that, during deliberations, the Court "may discharge a juror for bias, failure to deliberate, failure to follow the district court's instructions, or jury nullification when there is no reasonable possibility that the allegations of misconduct stem from the juror's view of the evidence." United States v. Kemp,

---

[3] Although Dougherty does not argue that bias should be imputed to Juror 12 as a matter of law, the Court notes that the Third Circuit "does not categorically impute bias to coworkers of key Government witnesses." United States v. Mitchell, 690 F.3d 137, 150 (3d Cir. 2012). Juror 12's relationship to O'Neill and O'Neill's relationship to the case are both much more attenuated than the relationships found inadequate to support imputed bias in Mitchell.

500 F.3d 257, 304 (3d Cir. 2007). In exercising its discretion to dismiss a juror during deliberations, the Court must be careful not to dismiss a juror for reasons related to "doubts the juror harbors about the sufficiency of the government's evidence." Id. at 303 (quoting United States v. Brown, 823 F.2d 591, 596 (D.C. Cir. 1987)). In Kemp, this Court initially received notes from the jury indicating that a juror was disregarding evidence and making statements reflecting pre-existing biases rather than the evidence or the law. Id. at 272. In response, the Court instructed the jury on its duty to deliberate and to consider the evidence and the law. Id. at 272-73. Subsequent notes from the jury and questioning of individual jurors revealed a problem of juror bias that led to the Court dismissing one juror. Id. at 273-77.

In United States v. Jackson, this Court gave the jury a similar supplemental instruction on its duty to deliberate after the jury sent a note indicating that it could not agree after just two hours of deliberations. 443 F.3d 293, 296-97 (3d Cir. 2006). The Third Circuit concluded that the supplemental instruction was not "unduly coercive," despite mentioning that the case would have to be retried if the jury were unable to reach a verdict. Id. at 297-98.

Here, the jury foreperson's note indicated that one juror seemed to be reaching conclusions based on factors other than the evidence and the law. Following the procedure affirmed in Kemp, and using a supplemental instruction similar to those used in Kemp and Jackson, the Court instructed the jury on its duties to deliberate, to consider the evidence, and to apply the law as set out in the jury instructions. The supplemental instruction here was effective and the jury reported no further problems with deliberations. The Court concludes that it did not err by giving the jury a supplemental instruction similar to the ones used in Kemp and Jackson, or by refusing to dismiss the unidentified juror. To the contrary, the Court's supplemental

instruction was a necessary and effective first step to ensure that the Court did not dismiss a juror due to the juror's views on the sufficiency of the evidence.

### III. Motion for Acquittal as to Counts V and VI

Counts V and VI of the indictment charged Dougherty with participating in the arson at a job site at 4900 Grays Avenue, Philadelphia, which took place on July 18, 2013. In challenging his conviction on these Counts, the defendant has relied on the Court's dismissal during the trial of the Quaker Meetinghouse arson charges against Dougherty in Counts III and IV of the indictment. Dougherty argues that the dismissal of Counts III and IV was based on Dougherty's lack of knowledge of the small, portable acetylene torch that was also later used to commit the arson at 4900 Grays Avenue. The defendant's brief is not a complete or fair version of the facts taken the light most favorable to the government, which is the appropriate standard. The Court dismissed Counts III and IV because there was no evidence at the trial that Dougherty had any advance knowledge of the Quaker Meetinghouse arson. Tr. 1/13/2015 at 8:1 – 9:2 (Court's findings). By contrast, for Counts V and VI, there was direct evidence that Dougherty provided the small acetylene torch to James Walsh shortly before the Grays Avenue arson and enough additional evidence to allow the jury to infer that Dougherty provided the torch with the specific intent that Walsh would use it to commit arson and sabotage a non-union work site.

The evidence showed that the small acetylene torch was purchased by the union on July 30, 2012 and that Dougherty signed the check to pay the invoice for the torch. Tr. 1/12/2015 at 166:15 – 167:12 (testimony of Special Agent Huff). Cooperating defendant James Walsh, who participated in the Quaker Meetinghouse arson, testified that the purchase of the torch was discussed at a union meeting and that he assumed it was purchased for the purpose of sabotaging non-union job sites because it was "too small to use anywhere else." Tr. 1/6/2015 at 194:18-25.

Walsh testified that ironworkers typically use a torch with oxygen and acetylene tanks that are four-and-a-half to five feet tall and weigh over one hundred pounds each, that he owned such a full-size torch at home, that ironworkers do not typically use a small, portable acetylene torch, and that in his 15 years as an ironworker he has never seen a small torch on a job site. Id. 195:1-18; Tr. 1/7/2015 at 20:15-18. Walsh also testified that when he asked Dougherty to help him find the torch in July 2013, Dougherty knew that the union had the small torch and knew what Walsh was talking about. Tr. 1/7/2015 at 21:24 –22:4.

Walsh testified that after the Quaker Meetinghouse arson, he was concerned about the media attention to the incident and how the union would react, and he asked Dougherty "if everything was okay" and Dougherty said "yeah, everything's good." Tr. 1/6/2015 at 197:23 – 198:17. Walsh himself did not tell Dougherty that he had committed the Quaker Meetinghouse arson. Tr. 1/7/2015 at 24:19 – 25:19 (testimony of Walsh). However, cooperating defendant and union business agent Edward Sweeney testified that after the Quaker Meetinghouse arson, he asked Dougherty if he had seen the news and told Dougherty that "Walsh and Gillin were up there and they – and they – they got out of hand and burned the crane." Tr. 1/8/2015 at 143:19 – 144:4, 223:11-21. According to Sweeney, in response Dougherty asked if they got caught. Id. 144:5-7.

Walsh testified that before the Grays Avenue arson, he went to the union hall to get the small torch. Tr. 1/6/2015 at 202:1-2. Walsh encountered Dougherty and "told him I had a job to do and I needed the little burning outfit." Id. 202:3-9. On cross-examination, Walsh denied telling Dougherty that he wanted the torch to do work at his house. Tr. 1/7/2015 at 23:9-11. Walsh testified that he and Dougherty went into the union's apprentice school where the torch was stored, searched for the torch, and finally Dougherty called apprentice coordinator Frank

Marsh to find out where the torch was located. Tr. 1/6/2015 at 202:10-15. Walsh further testified that the oxygen and acetylene bottles had not been refilled after being exhausted during the Quaker Meetinghouse arson, so Walsh had to swap them out for fresh bottles from the vendor Airgas before the Grays Avenue arson. Id. 202:16 – 203:1.

Frank Marsh, the apprentice coordinator for Ironworkers Local 401, was not charged with any criminal conduct but testified at the trial. Tr. 1/6/2015 at 113:8-12, 129:16-23. His testimony largely corroborated Walsh's testimony about the purpose of the small torch and Dougherty's role in giving it to Walsh. Marsh testified that he purchased the small acetylene torch for the apprentice school at the request of business agent Christopher Prophet. Id. 118:16 – 119:4, 132:17 – 133:18. Marsh also testified that the small torch was "not often" used in the apprentice school and that between December 2012 and July 2013, the torch was kept in the apprentice school but Marsh had not used the small torch nor had anyone asked to borrow it. Id. 119:5-9, 120:14-25, 133:13-14, 135:5-9. On direct examination, Marsh testified that Dougherty called him in the summer of 2013, asked "where the torch was," and said that "Jim Walsh asked to borrow it." Id. 121:1 – 122:1. On cross examination, Marsh repeated this testimony but, in response to defense counsel's questioning, equivocated between whether Dougherty "asked me where it was" or whether Dougherty asked "do we have a small torch." Id. 135:10 – 136:6. The Grays Avenue arson took place on July 18, 2013, shortly after this conversation.

Marsh also corroborated Walsh's testimony in wiretapped telephone calls from October 9, 2013 (after the Grays Avenue arson). While inquiring about a delivery order signed by Walsh for refilling the small acetylene torch, Marsh commented that "Joe [Dougherty] gave out this other unit to this Jimmy Walsh to use one time." Gov't Ex. 12; Tr. 1/6/2015 at 126:16-21 (Marsh testimony identifying "Joe" to mean "Joe Dougherty"). In a call with Walsh later that day, Marsh

asked Walsh what he was doing with the small torch, to which Walsh responded "Um, I got it from Joe [Dougherty], Joe knows I have it." Gov't Ex. 13; Tr. 1/6/2015 at 214:5-7 (Walsh testimony identifying "Joe" to mean "Joe Dougherty"). Marsh responded "How long you going to have it? Cause this, this is for the agents use this thing." Gov't Ex. 13. Walsh responded that Dougherty and all four union business agents knew that he had the small torch. Gov't Ex. 13; Tr. 1/6/2015 at 214:8-22 (Walsh testimony identifying "Ed," "Shawn," "Chris," and "Billy" to mean the four business agents Ed Sweeney, Sean O'Donnell, Chris Prophet, and Billy O'Donnell, and admitting that he had not spoken with Prophet or Billy O'Donnell about the torch and instead assumed they had heard about it from Sweeney or Sean O'Donnell).

The October 2013 wiretaps also recorded Dougherty making a number of comments that appeared to discuss Walsh and his arson nightwork for the union. On the morning of October 3, 2013, during a conversation about problems with Walsh at the Ultimate Towers job site, Dougherty commented about Walsh: "normally I like him, but <u>he does some things for us</u>, and now his attitude is, I don't, you know, like he's unapproachable or something, or he can't be corrected or something like that." Gov't Ex. 9 (emphasis added). Later that day, in a call with Sweeney discussing the same problems with the Ultimate Towers job, Dougherty stated "I don't want no bullshit on that f---ing job. Sabotage or any of that shit." Gov't Ex. 11. In the same call, Dougherty told Sweeney that the contractor at Ultimate Towers "just told me that you're hollering at [her] husband, threatening to sabotage the f---ing job." Id.

Six days later, on October 9, 2013, Dougherty and Sweeney spoke again and discussed what Walsh was planning to do with the small acetylene torch:

Dougherty: So, uh, uh, Jimmy, Jim, Jimmy Walsh, did, has that torch? That burning outfit? That little one.

Sweeney: Yeah. Yeah.

11

| | |
|---|---|
| Dougherty: | And ah, he's, he's been renewing the tanks. Is he doing something with them? |
| Sweeney: | Ah, yeah. |
| Dougherty: | Eh, but it ain't that job, ah. |
| Sweeney: | No, no. |
| Dougherty: | Ok. All right. Is ah, well that's fine if you, if you. |
| Sweeney: | He was work. |
| Dougherty: | Huh? |
| Sweeney: | He was working for ah, he was working for Sean [O'Donnell]. |
| Dougherty: | Ok. Well that's good. All right. He just got to be careful. And he is. That's good. I just didn't want him doing anything up there at the, candelabra thing.[4] |
| Sweeney: | No. No. Oh, no, no, no, no. |
| Dougherty: | Yeah, that's federal. We'd wind up, in. |
| Sweeney: | No, no, he's not, no. |

Gov't Ex. 14. The Malvern attempted arson occurred a few days after these conversations.

In summary, from these witnesses and intercepted phone calls, the jury could infer that before the Grays Avenue arson, Dougherty knew that Walsh was committing arson on behalf of the union and that Dougherty had a role in Walsh getting the torch, inferably for sabotage of non-union job sites. There is no evidence that Dougherty ever instructed anyone not to use the torch for sabotage, except for the Ultimate Towers ("candelabra") job. This allowed the jury to infer that Dougherty agreed the torch could be used for other sabotage.

Moreover, the jury could also infer that Dougherty took some responsibility for Walsh's actions, including the Grays Avenue arson, by saying that Walsh had done "some things for us"

---

[4] The evidence showed that "candelabra" referred to the communications tower where the Ultimate Towers job was taking place. Tr. 1/5/2015 at 151:8 – 152:5 (testimony of Special Agent Dimario).

12

and that any sabotage of the Ultimate Towers site was "federal. We'd wind up, in." Gov't Exs. 9, 14 (emphasis added). This first-person language, along with the absence of any discipline by Dougherty for using the torch in the past sabotage, allowed the jury to infer Dougherty's approval of the use of the torch for sabotage.

In addition, cooperating defendant and union business agent Sean O'Donnell testified that he gave reports about his territory by reading from prepared notes at union meetings attended by Dougherty. Tr. 1/12/2015 at 85:16 – 87:9. O'Donnell's testimony and notes showed that he announced at a union meeting in October 2011 that a non-union contractor had run into "an anchor bolt problem" and "his equipment wouldn't run," meaning that O'Donnell "got some guys together and we went out and did night work. Broke the anchor bolts and put something in the crane so it wouldn't run." Id. 92:22 – 93:4. O'Donnell testified that he made this announcement so that everyone would know that he was doing his job. Id. 93:5-9.

At a later union meeting in 2011, O'Donnell publicly thanked "the shadow crew for another job well done," meaning the men who had performed nightwork and broken anchor bolts at non-union job sites. Id. 95:8-21. And at one or more union meetings in 2012, O'Donnell again repeatedly referenced non-union contractors having anchor bolt problems and thanked "the shadow gang." Id. 97:3 – 98:16, 101:23 – 102:13, 103:15 – 104:1, 109:20 – 110:3. From this testimony, the jury could infer that Dougherty knew that members of the union were participating in a long-standing, ongoing campaign to sabotage non-union contractors who did not hire union members.

In all, the government presented evidence that Dougherty knew of the small acetylene torch and signed for its purchase, knew that Walsh had been involved in the Quaker Meetinghouse arson, knew that the small torch was not the type of torch that was typically used

by ironworkers in their day-to-day work, and knew that members of the union, including Walsh, were engaged in ongoing acts of sabotage against non-union contractors. With all this knowledge, Dougherty actively assisted Walsh in procuring the small acetylene torch to do an unspecified "job" by searching for the torch and calling Marsh to locate it, shortly before the Grays Avenue arson. There was also evidence from which the jury could infer that Dougherty later admitted some responsibility for Walsh's sabotage and arson. From the totality of this evidence, the jury could properly infer that, by helping Walsh procure the small acetylene torch, Dougherty intended to help Walsh commit an arson, even if Dougherty did not know the exact details of the plan or that the Grays Avenue site was the intended target.

Taking all the evidence in the light most favorable to the government, and considering the other evidence that showed that Dougherty, as Business Manager of the union, was at the forefront of the Union's campaign of sabotage and extortion directed at non-union contractors over a lengthy period of time, the Court concludes that Dougherty was proven to be liable, at least as an aider and abettor, for the Grays Avenue arson charged in Counts V and VI. See Dougherty, 2015 WL 1455908, at *24-25 (discussing the legal standard for aiding and abetting under federal law).

### IV.    Motion for Acquittal on Counts VII, VIII, and X

Dougherty also moved for acquittal on Counts VII, VIII, and X, but did not offer any additional argument with respect to these Counts.

Counts VII and VIII related to the attempted arson in Malvern in October 2013. As discussed above, prior to the Malvern incident, Dougherty had several conversations with Sweeney in which they discussed the small acetylene torch, Walsh, and job site sabotage. Although Dougherty directed Sweeney not to sabotage the Ultimate Towers job site, he did not

object when Sweeney informed him that Walsh was using the small torch for something for Sean O'Donnell instead. Based on the evidence, the jury could infer that the Malvern incident was the referenced work for Sean O'Donnell. <u>See</u> Tr. 1/5/2015 at 164:16 – 166:13 (testimony of Special Agent Dimario identifying the date of the Malvern incident and that it is within Sean O'Donnell's territory). The evidence also showed that Walsh did not return the small acetylene torch to the union hall after Dougherty helped him borrow it in July 2013 and before the Malvern incident. Govt' Ex. 12 (wiretapped conversation on October 9, 2013 in which Marsh said "Now Joe [Dougherty] gave out this other unit to this Jimmy Walsh to use one time. I don't know what he's doing with it he never brought it back."). In all, there was ample evidence from which the jury could conclude that Dougherty conspired to and attempted to commit the Malvern arson by providing the acetylene torch to Walsh and approving of Walsh's use of the torch for nightwork orchestrated by Sean O'Donnell.

As for Count X charging extortion of contractor Frank Bendinelli, the government's wiretaps recorded Dougherty directing and approving the extortion. Gov't Exs. 25-32. Of particular note, after Bendinelli offered to hire two union members, Dougherty instructed Sweeney "I'd tell him to go f--- his self," which caused Sweeney to tell the contractor that "my boss" "said no." Gov't Exs. 29-30. Bendinelli then acquiesced and gave up the job to a union contractor. This evidence was sufficient for the jury to conclude that Dougherty committed the extortion charged in Count X.

### V.   Conclusion

For the foregoing reasons, Dougherty's motion for judgment of acquittal and/or for a new trial will be **DENIED**. An appropriate order follows.